MURPHY & BUCHAL LLP
JAMES L. BUCHAL, OSB No. 921618
3425 SE Yamhill Street, Suite 100
Portland, OR 97214
Telephone: (503) 227-1011
Facsimile (503) 573-1939
jbuchal@mbllp.com

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK*
STEPHEN M. DUVERNAY*
400 Capitol Mall, Suite 2530
Sacramento, CA 95814
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Pro hac vice applications to be submitted*

Attorneys for Plaintiff
Great Northern Resources, Inc.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| GREAT NORTHERN RESOURCES, INC., <br><br> Plaintiff, <br><br> v. <br><br> KATY COBA, in her Official Capacity as State Chief Operating Officer and Director of the OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES; OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES; THE CONTINGENT; and DOES 1-10, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY, INJUNCTIVE, OR OTHER RELIEF** |

Plaintiff Great Northern Resources, Inc. complains of Defendants Katy Coba, in her official capacity as Chief Operating Officer and Director of the Oregon Department of Administrative Services; Oregon Department of Administrative Services; and The Contingent and alleges:

**INTRODUCTION**

1. Plaintiff Great Northern Resources, Inc. ("Great Northern") brings this lawsuit to challenge the constitutionality of the State of Oregon's use of strict race-based criteria for distributing money from the Oregon Cares Fund for Black Relief and Resiliency (the "Fund"), a $62-million dollar grant program established by the Oregon Legislature to provide financial relief to individuals and businesses that have been adversely impacted by the Covid-19 pandemic. Grants from the Fund are only available to individuals and business owners who "self-identify as Black." This express use of race in distributing government money is unprecedented and blatantly unconstitutional.

2. Great Northern is a small, family-run logging company based in Eastern Oregon that harvests salvage timber and sells it to a local mill. Like many small businesses around the state – and around the country – Great Northern's business has suffered as a result of the pandemic. Just when Great Northern was preparing its first timber delivery of the year, the local mill stopped making new log purchases due to the uncertainty of the future markets for lumber. Great Northern's timber has dried, cracked, and is not in condition to be sold to the mill.

3. After more than seven months of slow operations, the company has exhausted its modest operating capital reserves and its revenue is far eclipsed by costs and expenses. Great Northern estimates that the mill's closure and subsequent moratorium on buying timber cost the business $100,000, and the company projects a $200,000 loss for the year because of the pandemic's continuing economic effects.

4. The pandemic's harm to Great Northern should qualify it to compete in any government-aid program for businesses that have been affected by Covid-19. And yet the company is ineligible to receive a grant from the Fund because its owner is not Black.

5. This is unconstitutional. By distributing government benefits on the basis of race, Oregon has violated the Equal Protection Clause of the Fourteenth Amendment. "[D]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 214 (1995) (internal quotation marks omitted). Despite the Equal Protection Clause's unmistakable command of racial neutrality, Oregon has established a relief fund that is off limits for anyone who does not "self-identify as Black." This "discriminatory classification prevent[s] [Great Northern] from competing on an equal footing" with other applicants. *Id.* at 211 (quoting *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 667 (1993)).

6. As set forth below, defendants' conduct likewise violates federal antidiscrimination law, including Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

7. Accordingly, Great Northern seeks declaratory and injunctive relief to invalidate the state's use of race as an essential factor in the grant process.

**JURISDICTION AND VENUE**

8. This case raises questions under the Constitution of the United States, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d). This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. § 1331. Assignment to the Portland Division is appropriate because a substantial part of the events giving rise to this lawsuit occurred in Multnomah County, where Defendant The Contingent is headquartered.

9. Venue is proper under 28 U.S.C. section 1391(b).

**THE PARTIES**

10. Plaintiff Great Northern Resources, Inc. is a corporation organized under Oregon law.

11. Defendant Katy Coba is the Chief Operating Officer and Director of the Oregon Department of Administrative Services ("DAS"). Defendant DAS is the central administrative agency of the Oregon state government, which implements the policy and financial decisions made by the Governor and Oregon Legislature. Or. Rev. Stat. § 184.305; *see* Oregon Dep't of Admin.

Servs., *Administrative Overview* (Jan. 2014). DAS is responsible for overseeing the State's management and distribution of funds received from the Federal government through the Coronavirus Aid, Relief, and Economic Security Act's $150 billion Coronavirus Relief Fund. As COO and Director of DAS, Coba is responsible for managing and coordinating DAS' programs and operations, including the grant program and Fund that is the subject of this litigation. Coba is sued in her official capacity.

12. Defendant The Contingent is a Portland-based nonprofit corporation organized under Oregon law. As set forth in further detail below, for all relevant purposes The Contingent has acted jointly with the State of Oregon and Defendant DAS by administering the Fund such that it is a state actor and has been acting under color of state law.

13. The true names or capacities – whether individual, corporate, associate, or otherwise – of the Defendants named herein as Does 1-10, are presently unknown to Plaintiff, and are therefore sued by these fictitious names. Plaintiff prays for leave to amend this Complaint to show the true names or capacities of these Defendants if and when they have been determined.

## GENERAL ALLEGATIONS

**A.  The Oregon Legislature Established The Fund To Provide Coronavirus Relief Grants On The Basis Of Race.**

14. On July 14, 2020, the Oregon Legislature's Joint Emergency Board approved a $62 million grant to establish the Fund, using money allocated to the State by the Federal government in the CARES Act's $150 billion Coronavirus Relief Fund. The Fund is a grant program overseen by DAS and administered by two Oregon-based community organizations (The Contingent and the Black United Fund of Oregon) that are responsible for reviewing applications and making funding decisions.

15. DAS is "responsible for transmitting the [grant] funds and working with The Contingent on ensuring that federal spending, reporting, and other legal requirements are met, including that the funds are expended by December 30, 2020." Exhibit 1, Oregon State Leg. Joint Emergency Bd., Leg. Fiscal Office Analysis, Agenda Item 3: Oregon Cares Fund for Black Relief and Resiliency (July 14, 2020) ("Cares Fund Agenda Report"), at p. 2.

16. The Contingent is the recipient of the $62 million grant from DAS and is the organization responsible for managing business grants from the Fund. The Black United Fund of Oregon is responsible for managing grants to individuals from the Fund.

17. The Fund is explicitly targeted at providing relief to the "Black community," to support "Black relief and resiliency." Ex. 1, Cares Fund Agenda Report at p. 1. To be eligible for relief funds, individuals, families, and businesses must (1) live in or be based in Oregon, (2) demonstrate hardship due to COVID-19, and (3) "self-identify as Black." *Id.* Likewise, community-based non-profits are eligible for funds if they can demonstrate a significant tie to the Black community, which includes having an "[o]rganizational environment [that] is Black-focused and [being] recognized by the community served as a Black-serving organization," and at least 33% of the staff and a majority of the organization's leadership must be Black. *Id.* Individuals and families are eligible to receive grants up to $3,000, and businesses and community-based non-profits can receive up to $100,000 in grants. *Id.*

18. As part of the application process, individuals, families, and businesses seeking grants from the Fund must state whether they "identify" as Black – and funding decisions are based on whether applicants satisfy this threshold criteria.

19. Consistent with restrictions imposed by the federal government through the CARES Act, all funds allocated to the grant program must be expended by December 30, 2020. Cares Fund Agenda Report at p. 2.

**B.  Great Northern Applies For A Coronavirus Relief Grant From The Fund.**

20. Logging is an important business in Oregon. The State boasts 5 of the 10 largest sawmills (by volume of sawn wood) in the country. Oregon leads the nation in softwood lumber production, plywood production, and engineered wood. Sixty-five percent of Grant County in Eastern Oregon is classified as forestland, and twenty percent of county residents have forest sector jobs.

21. Great Northern is a small, family-run logging company based in Grant County. It was founded in 1991. The focus of Great Northern's business is selective harvesting and timber salvage – along with thinning and fuel reduction – on privately-owned and federally-managed

lands in Grant County, and then selling merchantable timber to local sawmills. Salvage logging is the practice of harvesting dead, dying, diseased, or down timber, which is essential to responsible and sustainable forest management.

22. Around the time Great Northern was preparing its first delivery of the year in March 2020, the local mill stopped making new log purchases because of uncertainty in the timber market induced by the pandemic. By the time the mill started buying again several months later, Great Northern's timber had dried and cracked, and was not in condition to be sold to the mill. (Unlike fresh timber that can sit for six months or more before being processed and cut into lumber, salvage logs have a short life span before they crack.)

23. Like many small businesses around the state, Great Northern's business has suffered during the pandemic. After over seven months of slow operations, the company has exhausted its modest operating capital reserves and company revenue is far eclipsed by its costs and expenses. Great Northern estimates that the mill's closure and subsequent moratorium on buying timber cost the business $100,000.

24. Over the past few months, Great Northern has applied to several government-relief programs to mitigate the impact of the pandemic, but so far it has received no financial assistance.

25. In April 2020, Great Northern applied for a grant of up to $10,000 from the U.S. Small Business Administration's economic injury disaster loan program. The SBA denied the company's application. Great Northern submitted a second application to the SBA, which was also denied.

26. In connection with its grant applications, the SBA informed Great Northern that it could obtain a loan from the SBA's COVID-19 EIDL program, but the company declined because it decided it would be too risky to take on debt given the uncertain economic outlook.

27. On September 24, 2020, Great Northern applied for an emergency grant through the Greater Eastern Oregon Development Corporation. The application was denied. Great Northern resubmitted an application to the program on October 19, 2020. As of this filing, Great Northern has not received a response to its second application.

28. On October 4, 2020, Great Northern submitted a grant application to the Fund through the Contingent's website. As part of the application, Great Northern described the pandemic's impact on its business, including the effect of the mill closure and moratorium discussed above.

29. Great Northern also submitted financial details showing that its revenue had dropped from approximately $150,000 in 2019 to less than $30,000 in 2020, and that the company projected a loss of approximately $200,000 for the year.

30. Finally, the application asked: "What percentage of owners of this business identify as Black?" Great Northern answered "0."

31. According to the Contingent, the earliest Great Northern will receive a response is October 31. But that response will be a denial: Great Northern is ineligible for a grant because its owner isn't Black. Great Northern brings this suit now, however, because it has sustained an injury-in-fact by being forced to compete in a race-based system for government benefits. *See Adarand Constructors*, 515 U.S. at 211; *Northeastern Fla. Chapter, Associated Gen. Contractors of Am.*, 508 U.S. at 666. Furthermore, time is of the essence because all funds in the grant program must be expended by December 30.

C.   **Defendants' Use Of Race To Distribute Grants From The Fund Violates The Equal Protection Clause And Federal Antidiscrimination Law.**

32. The Fourteenth Amendment's equal protection clause provides that, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amdt. 14, § 1.

33. "[T]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)). "Laws that explicitly distinguish between individuals on racial grounds fall within the core of [the Fourteenth Amendment's] prohibition." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). "'[A]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national

1    class.'" *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007)

2    (plurality opinion of Roberts, C.J.) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)) (internal

3    citation omitted).  Put simply, "[d]istinctions between citizens solely because of their ancestry are

4    by their very nature odious to a free people whose institutions are founded upon the doctrine of

5    equality." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (internal quotation marks omitted).

6          34.     "[O]ne form of injury under the Equal Protection Clause is being forced to compete

7    in a race-based system that may prejudice [a] plaintiff." *Parents Involved*, 551 U.S. at 719

8    (plurality opinion of Roberts, C.J.) (citing *Adarand Constructors*, 515 U.S. at 211; and

9    *Northeastern Fla. Chapter, Associated Gen. Contractors of Am.*, 508 U.S. at 666).

10         35.     "[A]ll racial classifications, imposed by whatever federal, state, or local

11   governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand*

12   *Constructors*, 515 U.S. at 227.  Under strict scrutiny, the government has the burden of proving

13   that racial classifications "are narrowly tailored measures that further compelling governmental

14   interests." *Id.*  "The reasons for strict scrutiny are familiar.  Racial classifications raise special

15   fears that they are motivated by an invidious purpose.  Thus, [the Supreme Court has] admonished

16   time and again that, '[a]bsent searching judicial inquiry into the justification for such race-based

17   measures, there is simply no way of determining . . . what classifications are in fact motivated by

18   illegitimate notions of racial inferiority or simple racial politics.'" *Johnson v. California*, 543 U.S.

19   499, 505–06 (2005) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)).

20         36.     Defendants' use of race as the qualifying factor in distributing grants from the Fund

21   fails strict scrutiny.  It is not based on a compelling interest, nor is it narrowly tailored.  *Aderand*,

22   515 U.S. at 227.

23         37.     The Supreme Court has stated repeatedly that addressing past societal

24   discrimination is not a compelling interest.  "[G]eneralized assertion[s]" of discrimination cannot

25   justify remedial race-based action because they "provide[] no guidance for a legislative body to

26   determine the precise scope of the injury it seeks to remedy.  It 'has no logical stopping point.'"

27   *J.A. Croson Co.*, 488 U.S. at 498 (quoting *Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 275

28   (1986)).  Likewise, "[a] generalized assertion of past discrimination in a particular . . . region is not

adequate because it 'provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.'" *Shaw v. Hunt*, 517 U.S. 899, 909 (1996) (citation omitted); *see also J.A. Croson Co.*, 488 U.S. at 499 ("an amorphous claim" of past discrimination insufficient to justify race-based quota system). Rather, the Equal Protection Clause requires the government to identify discrimination with specificity, have actual evidence of discrimination that demonstrates race-based action is necessary, and tailor any race-conscious action to that discrimination. *Shaw*, 517 U.S. at 909; *see also J.A. Croson Co.*, 488 U.S. at 500, 504.

38. But the Oregon Legislature did precisely what the Supreme Court has said it cannot do: It established the Fund based upon claims of generalized discrimination. The Joint Emergency Board's scant legislative record focuses broadly on general notions of past and present societal discrimination. *See* Multnomah County Board of County Commissioners, *Letter in Support of The Oregon Cares Fund* (July 10, 2020) (arguing that "Oregon's (and the country's) racist history has created a present in which Black Oregonians have been disproportionately impacted by the COVID pandemic," and claiming that "The Oregon Cares Fund would address this disproportionate impact by providing direct funding to Black individuals and families, Black-led businesses, and Black-owned organizations."); Washington County Administrative Office, *Letter RE: Emergency funding for the Oregon Cares Fund for Black Relief and Resiliency* (July 13, 2020) ("We join the call for accountability and concrete change to end racial injustice and the brutality that it gives rise to. We support the movement to dismantle systemic racism. We know that systemic racism contributes to economic, social, and health disparities that directly impact our county. [¶] We must, therefore, become an active part of the remedy. We are writing to respectfully urge you to support the Funding of the Oregon Cares Fund for Black Relief and Resiliency.").

39. The legislative analysis briefly mentions that "National and state data show that the Black community is one of the communities experiencing a disproportionate share of negative economic and health effects due to COVID-19," referencing a single draft report from the National

Bureau of Economic Research.  Ex. 1, Cares Fund Agenda Report, at p. 1.[1]  Even accepting as true the unfortunate circumstance that members of the Black community have been disproportionately impacted by the pandemic, this is not a form of "discrimination" that can be remedied by a race-based program.  In any event, the promoters of the Fund tied this disparate impact from the pandemic to generalized conditions by asserting that the pandemic has "widen[ed]" pre-existing "gaps" due to "400 years" of prior generalized discrimination within society.  "[R]emedying past societal discrimination does not justify race-conscious government action."  *Parents Involved*, 551 U.S. at 731 (opinion of Roberts, C.J.); *Shaw*, 517 U.S. at 909–910 ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest"); *see also Wygant*, 476 U.S. at 276 (plurality opinion) ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy."); *id*. at 288 (opinion of O'Connor, J.) (agreeing with plurality that "a governmental agency's interest in remedying 'societal' discrimination . . . cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny").

40. In fact, the materials presented to the legislature confirm that the Fund was motivated by a general desire to remedy past societal discrimination, which is not constitutionally permissible.  Yet the Fund's proponents put general societal discrimination front and center in the materials they submitted to the Joint Emergency Board:

> The Black community across Oregon is in the midst of two pandemics.  The first is this country's 400 years of racial violence and strategic divestment from the Black community, deepened here in Oregon through intentional policy and practice.  More recently, it is the Covid-19 pandemic that is widening the gaps between the average white Oregonian and the average Black Oregonian.  This gap must be narrowed through targeted investment in our community—**for Black people, for Black-owned businesses, and for Black community based organizations.**  And that narrowing includes **The Oregon Cares Fund.  The Oregon Cares Fund (TOCF) is a $62 million targeted investment in the Black community from the CARES Act's Coronavirus Relief Fund (CRF).**

---

[1] The report is Robert W. Fairlie, NBER Working Paper 27309, *The Impact of COVID-19 On Small Business Owners: Evidence of Early-Stage Losses From The April 2020 Current Population Survey*, Nat'l Bureau of Econ. Research (June 2020), online at https://www.nber.org/papers/w27309.pdf.

**Historic Disparities**

The myriad of issues requiring remedy prior to and exacerbated by the COVID-19 pandemic are institutional, and cannot be mitigated through one singular effort or fund. Black people began this pandemic far behind the average Oregonian whether it is in health, education, or economic prosperity. . . . **Immediate intervention is necessary to enable the Black community to meet basic needs and help us begin to chart a course for our collective recovery.**

Exhibit 2, Oregon State Leg. Joint Emergency Bd., July 14, 2020 Meeting Materials, Ex. 9, Testimony – The Oregon Cares Fund, *The Oregon Cares Fund: A Fund For Black Relief And Resiliency*, p. 3 of exhibit (labeled as page 8) (emphasis in original).

41.     Because Oregon did not link the grant program to specific, "identified discrimination," Defendants cannot establish that the program furthers a compelling state interest – and it is therefore "almost impossible" to conduct a narrow-tailoring inquiry. *J.A. Croson Co.*, 488 U.S. at 507. The Legislature's superficial analysis confirms that Defendants cannot meet their burden of showing that the use of race to distribute grants is narrowly tailored. Among other things, narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 206, 339 (2003); *see also J.A. Croson Co.*, 488 U.S. at 507 (minority set-aside program was not narrowly tailored in part because city had not considered "the use of race-neutral means" to achieve its interest); *Wygant*, 476 U.S. at 280 n.6 (plurality opinion) (noting that the term "narrowly tailored" "require[s] consideration" of "lawful alternative and less restrictive means"). But here, the Oregon Legislature gave no consideration of race-neutral alternatives – it just established a grant program that is reserved for members of a particular race.

42.     This record demonstrates that Defendants' use of race as a basis for eligibility for Fund grants cannot satisfy strict scrutiny. The Legislature failed to identify discrimination with specificity and failed to develop a "strong basis in evidence" before taking race-conscious action. *Shaw*, 517 U.S. at 909. The legislative record shows that the Fund is an attempt to address general societal discrimination. Accordingly, the use of race as the basis for distributing grants from the Fund violates the Constitution's Equal Protection guarantee.

\*     \*     \*

43. As set forth above, DAS is the agency responsible for implementing the Fund, which included transmitting $62 million in federal relief funds to the Contingent to establish the Fund, and "working with The Contingent on ensuring that federal spending, reporting, and other legal requirements are met." Ex. 1, Cares Fund Agenda Report at p. 2. This includes ensuring that the Fund satisfy the Oregon Legislature's directive that grant recipients meet the "[s]pecific requirement[]" that they "self-identify as Black." *Id.* at p. 1.

44. The Contingent was jointly engaged with DAS to administer the Fund and charged by the Oregon Legislature to distribute grants on the condition that recipients "self-identify as Black." The Contingent is therefore liable as a state actor for the purposes of 42 U.S.C. section 1983 because the Oregon Legislature "create[d] the legal framework governing [the Contingent's] conduct," "delegate[d] [the State's] authority" to the Contingent to deploy race-based classifications when overseeing the Fund, and generally "provided a mantle of authority" to the Contingent such that the organization was acting as the state itself when distributing grants from the Fund. *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

45. For those same reasons, Defendants' intentional discrimination against Plaintiff violates federal antidiscrimination law. The Supreme Court has "explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI [of the Civil Rights Act of 1964]." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). To a similar end, "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate [42 U.S.C.] § 1981." *Id.*; *see also Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (noting that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause").

46. An actual and judicially cognizable controversy exists between Plaintiff and Defendants regarding whether the Defendants' use of race as an essential factor in distributing grants from the Fund violates the Equal Protection Clause, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. Plaintiff desires a judicial declaration of its rights and Defendants' duties regarding the constitutionality of Defendants' distribution of government benefits on the basis of race.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### VIOLATION OF 42 U.S.C. § 1983 (EQUAL PROTECTION)

**(As to Defendants Coba and The Contingent)**

47. Plaintiff incorporates here by reference paragraphs 1 through 46, *supra*, as if fully set forth herein.

48. As set forth above, Defendants, acting under color of state law, have used race as an essential factor in considering applications and distributing grants from the Fund, *i.e.*, applicants must "self-identify as Black" to be eligible. By distributing government benefits on the basis of race, Defendants denied Plaintiff of the opportunity to compete on an equal basis for a coronavirus relief grant from the Fund, in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

### SECOND CAUSE OF ACTION

### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000d)

**(As to All Defendants)**

49. Plaintiff incorporates here by reference paragraphs 1 through 46, *supra*, as if fully set forth herein.

50. As set forth above, the State of Oregon received funds received from the Federal government through the Coronavirus Aid, Relief, and Economic Security Act's $150 billion Coronavirus Relief Fund, and used those funds to establish the Fund and grant program administered by Defendants.

51. Defendants have used race as an essential factor in considering applications and distributing grants from the Fund, *i.e.*, applicants must "self-identify as Black" to be eligible. By failing to consider Plaintiff's grant application on an equal basis as applicants that "self-identify as Black," Defendants have intentionally discriminated against Plaintiff on the basis of race in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.

//

### THIRD CAUSE OF ACTION

### VIOLATION OF 42 U.S.C. § 1981 (EQUAL RIGHTS UNDER LAW)

### (As to Defendants Coba and The Contingent)

52. Plaintiff incorporates here by reference paragraphs 1 through 46, *supra*, as if fully set forth herein.

53. As set forth above, Defendants, acting under color of state law, have used race as an essential factor in considering applications and distributing grants from the Fund, *i.e.*, applicants must "self-identify as Black" to be eligible. By failing to consider Plaintiff's grant application on an equal basis as applicants that "self-identify as Black," Defendants have intentionally discriminated against Plaintiff and impaired Plaintiff's right to make a contract on the basis of race in violation of 42 U.S.C. § 1981.

### **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment as follows:

1. Plaintiff respectfully requests that this Court, pursuant to 28 U.S.C. section 2201, enter a declaratory judgment stating that Defendants' use of race as an essential factor in considering grant applications submitted to the Fund, and restricting government benefits to those who "self-identify as Black," violates the Equal Protection Clause of the Fourteenth Amendment.

2. Plaintiff respectfully requests that this Court enter a declaratory judgment stating that Defendants' use of race as an essential factor in considering grant applications submitted to the Fund, and restricting government benefits to those who "self-identify as Black," violates Title VI of the Civil Rights Act of 1964.

3. Plaintiff respectfully requests that this Court enter a declaratory judgment stating that by using of race as an essential factor in considering grant applications submitted to the Fund and failing to consider Plaintiff's grant application on an equal basis as applicants that "self-identify as Black," Defendants have intentionally discriminated against Plaintiff and impaired Plaintiff's right to make a contract on the basis of race in violation of 42 U.S.C. section 1981.

4. Plaintiff respectfully requests that this Court enter a preliminary and permanent injunction enjoining Defendants, or any other person or entity acting in concert with them or under the authority of the State of Oregon, from using race as an essential factor in distributing relief funds allocated to the state by the Federal government from the CARES Act's Coronavirus Relief Fund.

5. Plaintiff respectfully requests nominal and compensatory damages.

6. Plaintiff respectfully requests costs of suit, including reasonable attorneys' fees under 42 U.S.C. section 1988 and any other applicable law, and all further relief to which Plaintiff may be justly entitled.

Dated: October 29, 2020                                MURPHY & BUCHAL LLP


By  *s/ James L. Buchal*
    JAMES L. BUCHAL
    Attorneys for Plaintiff
    Great Northern Resources, Inc.