BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK*
STEPHEN M. DUVERNAY*
400 Capitol Mall, Suite 2530
Sacramento, CA  95814
Telephone: (916) 447-4900
Facsimile:  (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

MURPHY & BUCHAL LLP
JAMES L. BUCHAL
3425 SE Yamhill Street, Suite 100
Portland, OR  97214
Telephone: (503) 227-1011
Facsimile (503) 573-1939
jbuchal@mbllp.com

*Pro hac vice

Attorneys for Plaintiff
Great Northern Resources, Inc.


## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION


| | |
|---|---|
| GREAT NORTHERN RESOURCES, INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>KATY COBA, in her Official Capacity as State Chief Operating Officer and Director of the OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES; OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES; THE CONTINGENT; and DOES 1-10,<br><br>                    Defendants. | Case No.:  3:20-cv-01866-IM<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**<br><br>**EXPEDITED HEARING AND ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND . ........................................................................................... 2

      A.    The Oregon Legislature Established The Fund To Provide Coronavirus Relief
            Grants On The Basis Of Race . ......................................................................... 2

      B.    Great Northern Applies For A Coronavirus Relief Grant From The Fund ....... 4

III.  NOTICE TO DEFENDANTS ........................................................................ 6

IV.   ARGUMENT ................................................................................................. 7

      A.    Great Northern Is Likely To Establish That Defendants' Use Of Race To
            Distribute Grants From The Fund Violates The Equal Protection Clause......... 7

            1.    The Defendants' Use Of Race As An Essential Factor In
                  Distributing Government Benefits Fails Strict Scrutiny ...................... 8

            2.    DAS And The Contingent Are Jointly Liable Under
                  42 U.S.C. § 1983 ................................................................................ 12

      B.    Great Northern Is Also Likely To Establish That Defendants' Conduct
            Violates Title VI Of The Civil Rights Act and 42 U.S.C. § 1981 ................. 13

      C.    Great Northern Will Be Irreparably Harmed Without A Temporary
            Restraining Order ........................................................................................... 14

      D.    The Balance Of Equities And Public Interest Both Favor Great Northern .... 16

IV. CONCLUSION ................................................................................................ 16

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Peña,*
    515 U.S. 200 (1995) .................................................................................................. 1, 8

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011)............................................................................................ 7

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009)..................................................................................... 7, 15

*Arizona Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014).......................................................................................... 16

*Assoc. General Contractors of Cal. v. Coalition for Econ. Equality,*
    950 F.2d 1401 (9th Cir. 1991).......................................................................................... 14

*Boardman v. Pac. Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016).......................................................................................... 15

*City of Los Angeles v. Sessions,*
    2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) ............................................................... 15

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989) .............................................................................................. 8, 9, 12

*D.M. by Bao Xiong v. Minn. State High Sch. League,*
    917 F.3d 994 (8th Cir. 2019)............................................................................................ 15

*Daviton v. Columbia/HCA Healthcare Corp.,*
    241 F.3d 1131 (9th Cir. 2001).......................................................................................... 13

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014).......................................................................................... 16

*Elrod v. Burns,*
    427 U.S. 347 (1976) ......................................................................................................... 15

*Fobbs v. Holy Cross Health Sys. Corp.,*
    29 F.3d 1439 (9th Cir. 1994)............................................................................................ 13

*Gratz v. Bollinger,*
    539 U.S. 244 (2003) ......................................................................................................... 14

*Grutter v. Bollinger,*
    539 U.S. 206 (2003) ................................................................................................... 12, 14

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017)............................................................................................ 15

*Int'l Franchise Ass'n, Inc. v. City of Seattle,*
    803 F.3d 389 (9th Cir. 2015)............................................................................................ 15

*Johnson v. California,*
   543 U.S. 499 (2005) ............................................................................................................. 8

*McDonald v. Santa Fe Trail Transp. Co.,*
   427 U.S. 273 (1976) ........................................................................................................... 14

*McLaughlin v. Florida,*
   379 U.S. 184 (1964) ............................................................................................................. 7

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ........................................................................................ 15, 16

*Miller v. Johnson,*
   515 U.S. 900 (1995) ............................................................................................................. 7

*Monterey Mech. Co. v. Wilson,*
   125 F.3d 702 (9th Cir. 1997) ............................................................................................. 15

*Nat'l Collegiate Athletic Ass'n v. Tarkanian,*
   488 U.S. 179 (1988) ........................................................................................................... 13

*Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville,*
   508 U.S. 656 (1993) .......................................................................................................... 1,8

*O'Donnell Const. Co. v. D.C.,*
   963 F.2d 420 (D.C. Cir. 1992) ........................................................................................... 15

*Pac. Kidney & Hypertension, LLC v. Kassakian,*
   156 F. Supp. 3d 1219 (D. Or. 2016) ................................................................................... 7

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) .................................................................................................. 7, 8, 11

*Patterson v. McLean Credit Union,*
   491 U.S. 164 (1989) ........................................................................................................... 14

*Pena-Rodriguez v. Colorado,*
   137 S. Ct. 855 (2017) ........................................................................................................... 7

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.,*
   337 F. Supp. 3d 308 (S.D.N.Y. 2018) ............................................................................... 15

*Preminger v. Principi,*
   422 F.3d 815 (9th Cir. 2005) ............................................................................................. 16

*Rice v. Cayetano,*
   528 U.S. 495 (2000) ............................................................................................................. 8

*Rodriguez v. Robbins,*
   715 F.3d 1127 (9th Cir. 2013) ........................................................................................... 16

*Shaw v. Hunt,*
   517 U.S. 899 (1996) .................................................................................................. 9, 11, 12

*Shaw v. Reno,*
  509 U.S. 630 (1993) ................................................................................................ 7

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,*
  240 F.3d 832 (9th Cir.2001) .................................................................................... 7

*Winter v. Natural Res. Defense Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................................ 7, 15

*Wygant v. Jackson Bd. Of Educ.,*
  476 U.S. 267 (1986) ................................................................................... 9, 11, 12

*Zepeda v. U.S. I.N.S.,*
  753 F.2d 719 (9th Cir. 1983) ................................................................................. 16

## Statutes

42 U.S.C. § 1981 ................................................................................................... 14

42 U.S.C. § 2000d ........................................................................................... 6, 13

Or. Rev. Stat. § 184.305 ........................................................................................ 2

U.S. Const., Amdt. 14, § 1 .................................................................................... 7

## Other Authorities

Oregon Dep't of Admin. Servs., *Administrative Overview* (Jan. 2014) ........................... 2

Mike Rogoway, *Oregon logging company challenges constitutionality of state fund to aid Black Oregonians*, The Oregonian (Oct. 30, 2020) ......................................................... 2, 3

# I. INTRODUCTION

Plaintiff Great Northern Resources, Inc. ("Great Northern") is challenging Oregon's use of strict race-based criteria for distributing money from the Oregon Cares Fund for Black Relief and Resiliency (the "Fund"), a $62-million dollar grant program established by the Oregon Legislature to provide financial relief to individuals and businesses that have been adversely affected by the Covid-19 pandemic.  Grants from the Fund are only available to individuals and business owners who "self-identify as Black."  This express use of race in distributing government money is blatantly unconstitutional.

Great Northern is a small, family-run logging company based in Eastern Oregon that harvests salvage timber and sells it to a local mill.  Like many small businesses around the state – and around the country – Great Northern's business has suffered as a result of the pandemic.  The pandemic's harm to Great Northern should qualify it to compete in any government-aid program for businesses that have been affected by Covid-19.  And yet the company is ineligible to receive a grant from the Fund because its owner is not black.

This is unconstitutional.  By distributing government benefits on the basis of race, Oregon has violated the Equal Protection Clause.  "[D]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."  *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 214 (1995) (citation omitted).  Despite the Equal Protection Clause's command of racial neutrality, Oregon has established a relief fund that is off limits for anyone who does not "self-identify as Black."  This "discriminatory classification prevent[s] [Great Northern] from competing on an equal footing" with other applicants. *Id.* at 211 (quoting *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 667 (1993)).  And because Defendants' conduct violates the Equal Protection Clause, it likewise violates federal antidiscrimination statutes, including Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

Accordingly, Great Northern seeks a temporary restraining order or preliminary injunction to halt the State's use of race as an essential factor in the grant process.  Time is of the

essence:  Consistent with restrictions imposed by the federal government through the CARES Act, all funds allocated to the program must be expended by December 30, 2020.  According to The Oregonian, the Fund has approved $21 million in payments and distributed $7 million of the $62 million in the Fund as of October 26.  Mike Rogoway, *Oregon logging company challenges constitutionality of state fund to aid Black Oregonians*, The Oregonian (Oct. 30, 2020).  This is a classic case for emergency injunctive relief, as the Fund is diminishing each day that the illegal program continues.  Absent injunctive relief, the Fund will be depleted and Great Northern (and similarly-situated businesses) will be denied the opportunity to compete for relief funds on an equal footing.

## II.  BACKGROUND

### A.    The Oregon Legislature Established The Fund To Provide Coronavirus Relief Grants On The Basis Of Race.

On July 14, 2020, the Oregon Legislature's Joint Emergency Board approved a $62 million grant to establish the Fund, using money allocated to the State by the Federal government from the CARES Act's $150 billion Coronavirus Relief Fund.  *See* Duvernay Decl., Ex. 1, Oregon State Leg. Joint Emergency Bd., Leg. Fiscal Office Analysis, Agenda Item 3: Oregon Cares Fund for Black Relief and Resiliency (July 14, 2020) ("Cares Fund Agenda Report").  The Fund is a grant program overseen by Defendant Oregon Department of Administrative Services ("DAS")[1] and administered by two Oregon-based community organizations (The Contingent and the Black United Fund of Oregon) that are responsible for reviewing applications and making funding decisions.  *See id.*

The Legislature established the Fund by providing a $62 million grant to Defendant The Contingent.  Cares Fund Agenda Report at p. 1.  DAS is "responsible for transmitting the [grant]

---

[1]    DAS is the central administrative agency of the Oregon state government, which implements the policy and financial decisions made by the Governor and Oregon Legislature. Or. Rev. Stat. § 184.305; *see* Oregon Dep't of Admin. Servs., *Administrative Overview* (Jan. 2014).

funds and working with The Contingent on ensuring that federal spending, reporting, and other legal requirements are met, including that the funds are expended by December 30, 2020." *Id.* at p. 2. The Contingent is responsible for managing business grants from the Fund, and the Black United Fund of Oregon is responsible for managing grants to individuals. *Id.* at p. 1.

The Fund is explicitly targeted at providing relief to the "Black community" to support "Black relief and resiliency." Cares Fund Agenda Report at p. 1. The Fund's website includes a video that describes the Fund this way: "This is a fund that was designed for and by black people in the State of Oregon to help us deal with these Covid-19 realities. It is for businesses, individuals, and civic organizations. This is an unprecedented step for parity and equity for people of color – black people – in the State of Oregon." The Oregon Cares Fund for Black Relief + Resiliency, *Frequently Asked Questions*, https://www.theoregoncaresfund.org/faqs-1 ("Fund Website FAQ Video").[2]

To be eligible for grant funds, individuals, families, and businesses must (1) live in or be based in Oregon, (2) demonstrate hardship due to COVID-19, and (3) "self-identify as Black." Cares Fund Agenda Report at p. 1. Individuals and families are eligible to receive grants up to $3,000, and businesses can receive up to $100,000 in grants. *Id.*

As part of the application process, businesses, individuals, and families seeking grants from the Fund must state whether they "identify" as black – and funding decisions are based on whether applicants satisfy this threshold criteria. Cares Fund Agenda Report at p. 2. For businesses, the Fund's website emphasizes that "in order to qualify for the Fund you have to be at least 51% black owned. That's important." Fund Website FAQ Video.

Consistent with restrictions imposed by the federal government through the CARES Act, all funds allocated to the grant program must be expended by December 30, 2020. Cares Fund Agenda Report at p. 2. According to The Oregonian, the Fund has approved payments for $21 million and distributed $7 million of the $62 million as of October 26. Rogoway, *supra*.

---

[2]    The Contingent has uploaded the video to Vimeo, *The Oregon Cares Fund for Black Relief + Resiliency, Information & Application Guide Video*, https://vimeo.com/470054764.

**B.      Great Northern Applies For A Coronavirus Relief Grant From The Fund.**

Logging is an important business in Oregon.  The State boasts 5 of the 10 largest sawmills (by volume of sawn wood) in the country.  The Sawmill Database, *Highest production of sawn wood in USA*, https://bit.ly/3mv4PQK.  Oregon leads the nation in softwood lumber production, plywood production, and engineered wood.  *See generally* Oregon Forest Resources Inst., *Oregon Forest Facts 2019-20 Edition* (2019), https://bit.ly/2Tu0KQ7.  Sixty-five percent of Grant County in Eastern Oregon is classified as forestland, and twenty percent of county residents have forest-sector jobs.  Oregon Forest Resources Inst., *Economic Fact Sheet – Grant County*, available at https://oregonforests.org/node/9.

Great Northern is a small, family-run logging company based in Grant County.  Houpt Decl., ¶ 2.  It was founded in 1991.  *Id.*  The focus of Great Northern's business is selective harvesting and timber salvage, along with thinning and fuel reduction, on privately owned and federally managed lands in Grant County, and then selling merchantable timber to local sawmills.  *Id.*  Salvage logging is the practice of harvesting dead, dying, diseased, or down timber, which is essential to responsible and sustainable forest management.  *Id.*

In the late winter or early spring (depending on the weather), Great Northern begins its yearly timber operations.  Houpt Decl., ¶ 3.  Around the time Great Northern was preparing its first delivery of the year in March 2020, the local mill stopped making new log purchases because of uncertainty in the timber market induced by the pandemic.  *Id.*  By the time the mill started buying again several months later, Great Northern's timber had dried and cracked, and was not in condition to be sold to the mill.  *Id.*  (Unlike fresh timber that can sit for six months or more before being processed and cut into lumber, salvage logs have a short life span before they crack.  *Id.*)

Like many small businesses around the state, Great Northern's business has suffered during the pandemic.  After more than seven months of slow operations, the company has exhausted its modest operating capital reserves and company revenue is far eclipsed by its costs

and expenses.  Houpt Decl., ¶ 4.  Great Northern estimates that the mill's moratorium on buying timber cost the business $100,000, and the company may lose far more in 2020.  *Id.*

Great Northern has applied to multiple government-relief programs to mitigate the impact of the pandemic, but so far it has received no financial assistance.  Houpt Decl., ¶ 5.  In April 2020, Great Northern applied for a grant of up to $10,000 from the U.S. Small Business Administration's economic injury disaster loan program.  *Id.*, ¶ 6.  The SBA denied the company's application.  *Id.*  Great Northern submitted a second application to the SBA, which was also denied.  *Id.*  In connection with its grant applications, the SBA informed Great Northern that it could obtain a loan from the SBA's COVID-19 EIDL program, but the company declined because it decided it would be too risky to take on debt given the uncertain economic outlook. *Id.*, ¶ 7.

On September 24, 2020, Great Northern applied for an emergency grant through the Greater Eastern Oregon Development Corporation.  Houpt Decl., ¶ 8.  The application was denied.  *Id.*  Great Northern resubmitted an application to the program on October 19, 2020.  *Id.*

On October 4, 2020, Great Northern submitted a grant application to the Fund through the Contingent's website.  Houpt Decl., ¶ 9.  As part of the application, Great Northern described the pandemic's impact on its business, including the effect of the mill's moratorium discussed above.  *Id.*  Great Northern also submitted financial details showing that its revenue has plummeted in 2020, and that the company projected a substantial loss for the year.  *Id.*  Finally, the application asked: "What percentage of owners of this business identify as Black?"  *Id.* Great Northern answered "0."  *Id.*

According to the Contingent, the earliest Great Northern would receive a response was October 31.  Houpt Decl., ¶ 10.  But Great Northern is not eligible for relief under the program, because its owner is not black.  Great Northern filed this case and brings this motion to halt the program's unconstitutional reliance on race.

*   *   *

Great Northern filed its Complaint on October 29, 2020, naming as defendants The Contingent, DAS, and Katy Coba (Chief Operating Officer and Director of DAS) in her official capacity.  It asserted claims under the Equal Protection Clause and 42 U.S.C. § 1981, and a claim for violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d).

## III.  NOTICE TO DEFENDANTS

Pursuant to Fed. R. Civ. P. 65, Great Northern gave Defendants notice of its intention to seek a temporary restraining order and the nature of the relief they request in this motion. Buchal Decl., ¶¶ 2–3; Duvernay Decl., ¶¶ 2–8.  On the afternoon the case was filed, Great Northern's counsel sent a copy of the complaint to a senior attorney at the Oregon Department of Justice and informed him of Great Northern's intent to file for a temporary restraining order. Buchal Decl., ¶ 2.  On November 2, Great Northern's counsel sent a copy of the summons, complaint, and case-assignment materials to that same attorney – and again noted Great Northern's intent to seek a temporary restraining order.  Duvernay Decl., ¶ 6.  In response, the attorney confirmed that the materials had been passed to the State's Chief Trial Counsel.  *Id.* The Chief Trial Counsel confirmed that the State Defendants had retained outside counsel; Great Northern's counsel has informed the State Defendants' attorneys that the basis for this motion were the bases set out in the complaint.  *Id.*, ¶ 7–8.

On October 30, Great Northern's counsel sent a copy of the summons, complaint, and case-assignment materials to The Contingent's registered agent for service of process, and notified it of Great Northern's intent to file for a temporary restraining order.  Duvernay Decl., ¶ 2.  On November 2, Great Northern's counsel spoke with The Contingent's counsel about the substance of this motion and the specific grounds for the requested relief.  *Id.*, ¶ 3.  The Contingent's attorneys accepted service of the summons and appeared in the action on November 3.

Great Northern's counsel will serve copies of this brief and supporting materials on Defendants' counsel by e-mail immediately after filing.  Duvernay Decl., ¶ 9.

## IV.  ARGUMENT

"In deciding whether to grant a motion for a temporary restraining order ('TRO'), courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction." *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 (D. Or. 2016); *see also Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir.2001) (a court's "analysis is substantially identical for [an] injunction and [a] TRO")).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).  Alternatively, injunctive relief "is appropriate when a plaintiff demonstrates that serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (ellipsis omitted).

A.     **Great Northern Is Likely To Establish That Defendants' Use Of Race To Distribute Grants From The Fund Violates The Equal Protection Clause.**

The Equal Protection Clause provides that, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., Amdt. 14, § 1.  "[T]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States."  *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)).  "Laws that explicitly distinguish between individuals on racial grounds fall within the core of [the Fourteenth Amendment's] prohibition." *Shaw v. Reno*, 509 U.S. 630, 642 (1993).  "'[A]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'"  *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007) (plurality opinion of Roberts, C.J.) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)) (internal citation omitted).  Put

simply, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (citation omitted).

"[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice [a] plaintiff." *Parents Involved*, 551 U.S. at 719 (plurality opinion of Roberts, C.J.) (citing *Adarand Constructors*, 515 U.S. at 211; and *Northeastern Fla. Chapter, Associated Gen. Contractors of Am.*, 508 U.S. at 666). "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors*, 515 U.S. at 227. Under strict scrutiny, the government has the burden of proving that racial classifications "are narrowly tailored measures that further compelling governmental interests." *Id.* "The reasons for strict scrutiny are familiar. Racial classifications raise special fears that they are motivated by an invidious purpose. Thus, [the Supreme Court has] admonished time and again that, '[a]bsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining . . . what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Johnson v. California*, 543 U.S. 499, 505–06 (2005) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)).

1.    **The Defendants' Use Of Race As An Essential Factor In Distributing Government Benefits Fails Strict Scrutiny.**

Great Northern would be qualified for a grant from the Fund – it is based in Oregon and has demonstrated hardship due to Covid-19 – but for the fact that its owner is not black. Defendants' use of race as the qualifying factor in distributing grants from the Fund fails strict scrutiny. It is not based on a compelling interest, nor is it narrowly tailored. *Aderand*, 515 U.S. at 227.

The Supreme Court has stated repeatedly that addressing past societal discrimination is not a compelling interest. "[G]eneralized assertion[s]" of past discrimination cannot justify remedial race-based action because they "provide[] no guidance for a legislative body to

determine the precise scope of the injury it seeks to remedy.  It 'has no logical stopping point.'"

*J.A. Croson Co.*, 488 U.S. at 498 (quoting *Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 275

(1986) (opinion of O'Connor, J.)).  Likewise, "[a] generalized assertion of past discrimination in

a particular . . . region is not adequate because it 'provides no guidance for a legislative body to

determine the precise scope of the injury it seeks to remedy.'"  *Shaw v. Hunt*, 517 U.S. 899, 909

(1996) (citation omitted); *see also J.A. Croson Co.*, 488 U.S. at 499 ("an amorphous claim" of

past discrimination insufficient to justify race-based quota system).

Precisely because "[r]acial classifications are antithetical to the Fourteenth Amendment,"

the Supreme Court has placed strict constraints on a State's use of racial distinctions.  *Shaw*, 517

U.S. at 909.  When a State seeks to "remedy[] the effects of past or present racial

discrimination," it "must satisfy two conditions" to establish a "compelling state interest."  *Id*.

First, the discrimination must be "'identified discrimination'" – a state "must identify"

discrimination "with some specificity."  *Id.* (quoting *J.A. Croson Co.*, 488 U.S. at 504).  Second,

a State "must have had a 'strong basis in evidence' to conclude that remedial action was

necessary, '*before* it embarks'" on race-conscious action.  *Shaw*, 517 U.S. at 909 (citations

omitted; emphasis in *Shaw*); *J.A. Croson Co.*, 488 U.S. at 500 (there must be a "strong basis in

evidence" to demonstrate necessity of racial classifications, and "simple legislative assurances of

good intention cannot suffice").[3]

But the Oregon Legislature did precisely what the Supreme Court has said it cannot do:

It established the Fund based upon claims of generalized discrimination.  The Joint Emergency

Board's scant legislative record focuses broadly on general notions of past and present societal

---

[3]      In fact, the State's Legislative Counsel warned – in connection with the State's
consideration of race- or gender-based Covid-relief programs – that "[w]ithout any [evidentiary]
findings, the [grant] program would almost certainly be unconstitutional under the Fourteenth
Amendment," and that "in order for [the agency] to constitutionally operate the grant program,
[it] would first need to develop evidence of past discrimination."  Duvernay Decl., Ex. 2, Oregon
Leg. Counsel Comm., *Letter Re: Allocation of moneys based on race and gender classifications*
(July 13, 2020), p. 2.  This letter was included in the Joint Emergency Board's materials for the
July 14 meeting when it approved the Fund, but the Board appears to have ignored the warning.

discrimination.  *See* Multnomah County Board of County Commissioners, *Letter in Support of The Oregon Cares Fund* (July 10, 2020) (arguing that "Oregon's (and the country's) racist history has created a present in which Black Oregonians have been disproportionately impacted by the COVID pandemic," and claiming that "The Oregon Cares Fund would address this disproportionate impact by providing direct funding to Black individuals and families, Black-led businesses, and Black-owned organizations."); Washington County Administrative Office, *Letter RE: Emergency funding for the Oregon Cares Fund for Black Relief and Resiliency* (July 13, 2020) ("We join the call for accountability and concrete change to end racial injustice and the brutality that it gives rise to.  We support the movement to dismantle systemic racism.  We know that systemic racism contributes to economic, social, and health disparities that directly impact our county.  [¶]  We must, therefore, become an active part of the remedy.  We are writing to respectfully urge you to support the Funding of the Oregon Cares Fund for Black Relief and Resiliency.").[4]

The legislative analysis briefly mentions that "National and state data show that the Black community is one of the communities experiencing a disproportionate share of negative economic and health effects due to COVID-19," referencing a single draft report from an economist at the National Bureau of Economic Research.  Cares Fund Agenda Report, at p. 1.[5] Even accepting as true the unfortunate circumstance that members of the black community have been disproportionately impacted by the pandemic, this is not a form of "discrimination" that can be remedied by a race-based program.  In any event, the promoters of the Fund tied this disparate impact from the pandemic to generalized conditions by asserting that the pandemic has "widen[ed]" pre-existing "gaps" due to "400 years" of prior societal discrimination.  Duvernay

---

[4]     The letters from Multnomah and Washington Counties are attached as Exhibits 3 and 4 to the Declaration of Stephen M. Duvernay.

[5]     The report is Robert W. Fairlie, NBER Working Paper 27309, *The Impact of COVID-19 On Small Business Owners: Evidence of Early-Stage Losses From The April 2020 Current Population Survey*, Nat'l Bureau of Econ. Research (June 2020), online at https://www.nber.org/papers/w27309.pdf.

Decl., Ex. 5, Oregon State Leg. Joint Emergency Bd., July 14, 2020 Meeting Materials, Ex. 9,

Testimony – The Oregon Cares Fund, *The Oregon Cares Fund: A Fund For Black Relief And*

*Resiliency*, p. 3 of exhibit (labeled as page 8) ("Oregon Cares Fund Overview").  But "remedying

past societal discrimination does not justify race-conscious government action." *Parents*

*Involved*, 551 U.S. at 731 (opinion of Roberts, C.J.); *Shaw*, 517 U.S. at 909–10 ("[A]n effort to

alleviate the effects of societal discrimination is not a compelling interest"); *see also Wygant*,

476 U.S. at 276 (plurality opinion) ("Societal discrimination, without more, is too amorphous a

basis for imposing a racially classified remedy."); *id*. at 288 (opinion of O'Connor, J.) (agreeing

with plurality that "a governmental agency's interest in remedying 'societal' discrimination . . .

cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny").

   The materials presented to the Legislature in support of the Fund further demonstrate it

was conceived as an impermissible means of remedying past societal discrimination.  The Fund's

proponents put general societal discrimination front and center in the materials they submitted to

the Joint Emergency Board:

> The Black community across Oregon is in the midst of two pandemics.  The first
> is this country's 400 years of racial violence and strategic divestment from the
> Black community, deepened here in Oregon through intentional policy and
> practice.  More recently, it is the Covid-19 pandemic that is widening the gaps
> between the average white Oregonian and the average Black Oregonian.  This gap
> must be narrowed through targeted investment in our community—**for Black**
> **people, for Black-owned businesses, and for Black community based**
> **organizations.**  And that narrowing includes **The Oregon Cares Fund.  The**
> **Oregon Cares Fund (TOCF) is a $62 million targeted investment in the Black**
> **community from the CARES Act's Coronavirus Relief Fund (CRF).**
>
> **<u>Historic Disparities</u>**
>
> The myriad of issues requiring remedy prior to and exacerbated by the COVID-19
> pandemic are institutional, and cannot be mitigated through one singular effort or
> fund. Black people began this pandemic far behind the average Oregonian
> whether it is in health, education, or economic prosperity.  . . .  Immediate
> intervention is necessary to enable the Black community to meet basic needs and
> help us begin to chart a course for our collective recovery.

Oregon Cares Fund Overview, p. 3 of exhibit (labeled as page 8) (emphasis in original).

Because Oregon did not link the grant program to specific, "identified discrimination," Defendants cannot establish that the program furthers a compelling state interest – and it is therefore "almost impossible" to conduct a narrow-tailoring inquiry. *J.A. Croson Co.*, 488 U.S. at 507. The Legislature's superficial analysis confirms that Defendants cannot meet their burden of showing that the use of race to distribute grants is narrowly tailored. Among other things, narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 206, 339 (2003); *see also J.A. Croson Co.*, 488 U.S. at 507 (minority set-aside program was not narrowly tailored in part because city had not considered "the use of race-neutral means" to achieve its interest); *Wygant*, 476 U.S. at 280 n.6 (plurality opinion) (noting that the term "narrowly tailored" "require[s] consideration" of "lawful alternative and less restrictive means"). But here, the Oregon Legislature gave no consideration of race-neutral alternatives – it just established a grant program that is reserved for members of a particular race.

This record demonstrates that Defendants' use of race as a basis for eligibility for Fund grants cannot satisfy strict scrutiny. The Legislature failed to identify discrimination with specificity and failed to develop a "strong basis" of evidence before taking race-conscious action. *Shaw*, 517 U.S. at 910. The legislative record shows that the Fund is an attempt to address general societal discrimination. Accordingly, the use of race as the basis for distributing grants from the Fund violates the Constitution's Equal Protection guarantee.

    **2.**    **DAS And The Contingent Are Jointly Liable Under 42 U.S.C. § 1983.**

As set forth above, DAS is the agency responsible for implementing the Fund, which included transmitting $62 million in federal relief funds to the Contingent to establish the Fund, and "working with The Contingent on ensuring that federal spending, reporting, and other legal requirements are met." Cares Fund Agenda Report at p. 2. This includes ensuring that the Fund satisfy the Oregon Legislature's directive that grant recipients meet the "[s]pecific requirement[]" that they "self-identify as Black." *Id.* at p. 1.

The Contingent was jointly engaged with DAS to administer the Fund and charged by the Oregon Legislature to distribute grants on the condition that recipients "self-identify as Black." The Contingent is therefore liable as a state actor for the purposes of 42 U.S.C. § 1983 because the Oregon Legislature "create[d] the legal framework governing [the Contingent's] conduct," "delegate[d] [the State's] authority" to the Contingent to deploy race-based classifications when overseeing the Fund, and generally "provided a mantle of authority" to the Contingent such that the organization was acting as the state itself when distributing grants from the Fund. *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

\* \* \*

Defendants, acting under color of state law, have used race as an essential factor in considering applications and distributing grants from the Fund, *i.e.*, applicants must "self-identify as Black" to be eligible. By distributing government benefits on the basis of race, Defendants denied Great Northern of the opportunity to compete on an equal basis for a coronavirus relief grant from the Fund, in violation of the Equal Protection Clause. Accordingly, Great Northern has established a probability of prevailing on its Equal Protection claim.

**B.    Great Northern Is Also Likely To Establish That Defendants' Conduct Violates Title VI Of The Civil Rights Act and 42 U.S.C. § 1981.**

Defendants' intentional discrimination against Great Northern also violates federal antidiscrimination statutes, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., and 42 U.S.C. § 1981. Title VI states that "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To state a claim under Title VI, "a plaintiff must allege that (1) the entity involved is engaging in race discrimination; and (2) the entity involved is receiving federal financial assistance." *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), overruled on other grounds, *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1133 (9th Cir. 2001). The facts set out above establish both requirements.

Section 1981 prohibits racial discrimination in the making and enforcement of contracts, and it applies to both the government and private actors.  42 U.S.C. § 1981(a), (c).  The statute is "meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race."  *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295–96 (1976)).  Among other things, Section 1981 "prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms."  *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–77 (1989).  Businesses applying to the Fund must attest and confirm that they "agree to the conditions of this application," which include, among other things, assurances that funds will only be used for certain types of expenses.  Duvernay Decl., Ex. 6, Oregon Cares Business And Nonprofit Application, Attestation.

For the same reasons that Defendants have violated Great Northern's constitutional rights, their intentional discrimination against Great Northern violates both of these provisions of federal antidiscrimination law, which are at least coextensive with the Equal Protection Clause. The Supreme Court has "explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI [of the Civil Rights Act of 1964]."  *Gratz*, 539 U.S. at 276 n.23.  Similarly, "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate [42 U.S.C.] § 1981."  *Id.*; *see also Grutter*, 539 U.S. at 343 (noting that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"); accord *Assoc. General Contractors of Cal. v. Coalition for Econ. Equality*, 950 F.2d 1401, 1412 n.8 (9th Cir. 1991).

**C.    Great Northern Will Be Irreparably Harmed Without A Temporary Restraining Order.**

Great Northern is irreparably harmed by Defendants' violations.  As the Ninth Circuit has repeatedly emphasized, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th

Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, (1976)); *see Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) (same).  "[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted).

The particular circumstances of Great Northern's equal-protection injury heighten the necessity of relief here.  Discrimination that prevents a plaintiff from competing on equal footing in a contracting process constitutes irreparable harm standing on its own.  *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("it is not apparent to us how [damages] would remedy" harm from unconstitutional discrimination in bidding process since the Ninth Circuit has "stated that an alleged constitutional infringement will often alone constitute irreparable harm") (citation omitted).  *See also, e.g.*, *City of Los Angeles v. Sessions*, 2019 WL 1957966, at *5 (C.D. Cal. Feb. 15, 2019) (city seeking federal grants would "suffer irreparable harm because it will be barred from receiving a funding opportunity," and would also "will suffer irreparable competitive harm if Defendants are not enjoined from imposing the Conditions in future cycles" (citing *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015)); *O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 428–29 (D.C. Cir. 1992) (business irreparably harmed when forced to compete in discriminatory contracting process that violated equal protection); *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 342–43 (S.D.N.Y. 2018) (finding irreparable harm "based on inability to compete" under unlawful federal grant regulations, citing *Int'l Franchise Ass'n, Inc.*, *supra*).

The risk of harm is guaranteed because the program is required to expend all funds before the end of the year.  "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22).  And "deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019).

**D.      The Balance Of Equities And Public Interest Both Favor Great Northern.**

When the government is a party, the balance-of-equities and public-interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  And by establishing a likelihood that Defendants have violated the Constitution, Great Northern has "also established that both the public interest and the balance of the equities favor a preliminary injunction." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).  This is because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002; *accord Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.").

Conversely, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (the state "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations").  The public interest is unquestionably served by opening up the grant process to all Oregonians, rather than discriminating against all non-black Oregonians.

## IV.  CONCLUSION

For the reasons set forth above, the Court should issue a temporary restraining order or preliminary injunction that enjoins Defendants, or any other person or entity acting in concert with them or under the authority of the State of Oregon, from using race as an essential factor in distributing relief funds allocated to the state by the Federal government from the CARES Act's Coronavirus Relief Fund.

Dated:  November 7, 2020                BENBROOK LAW GROUP, PC

                                        By _____
                                        BRADLEY A. BENBROOK
                                        Attorneys for Plaintiff
                                        Great Northern Resources, Inc.