Clifford S. Davidson, OSB No. 125378
csdavidson@swlaw.com
SNELL & WILMER L.L.P.
One Centerpointe Drive, Suite 170
Lake Oswego, OR  97035
Telephone: (503) 624-6800
Facsimile:  (503) 624-6888

> Special Assistant Attorney General on behalf of
> Defendants Katy Coba, in her Official Capacity as State
> Chief Operating Officer and Director of the Oregon
> Department of Administrative Services; and Oregon
> Department of Administrative Services.

> Additional Counsel of Record Listed on Signature Page.

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| GREAT NORTHERN RESOURCES, INC., | Case No. 3:20-cv-01866-IM |
| Plaintiff, | Defendants' |
| vs. | **JOINT MEMORANDUM REGARDING WHETHER PLAINTIFF CAN SHOW IRREPARABLE INJURY NECESSARY FOR A PRELIMINARY INJUNCTION** |
| KATY COBA, in her Official Capacity as State Chief Operating Officer and Director of the Oregon Department of Administrative Services; OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES; THE CONTINGENT; and DOES 1-10, | |
| Defendants. | *Declarations of Ben Sand and Clifford S. Davidson filed concurrently.* |
| | [Pursuant to the Court's Order of November 10, 2020.] |

DEFENDANTS' MEMORANDUM
RE IRREPARABLE INJURY

## I.  __INTRODUCTION__

After unsuccessfully seeking assistance from other government relief programs, Plaintiff

Great Northern Resources, Inc. ("Great Northern") applied for assistance from The Contingent

for money that was made available through the Oregon Cares Fund for Black Relief and

Resiliency (the "Fund"). The Fund denied Great Northern's application for reasons other than

race, including that the application sought $100,000 in personnel costs despite having no

employees. (Declaration of Ben Sand Ex. 1.)

Great Northern now seeks a broad injunction from this Court, prohibiting the use of race-

based criteria in evaluating Fund applications going forward. While Great Northern would have

this Court immediately peer through the "fractured prism" of equal protection jurisprudence,

*Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1161 (10th Cir. 2000), that can wait. Great

Northern lacks standing to seek the injunctive relief it requests both because Great Northern

itself does not face any future harm and because Great Northern's purported injury could be

redressed through money. While Great Northern does not face the prospect of any future injury,

Oregon's Black community certainly does.

The denial of Great Northern's application dooms its request for injunctive relief.

Injunctive relief's sole purpose is to prevent *future* harm to the party seeking it.  *United States v.*

*W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (citing *Swift & Co. v. United States*, 276 U.S. 311,

326 (1928)). Great Northern faces no future harm and can only obtain redress of the *past* asserted

harm of the denial of its application. That asserted harm cannot recur; Great Northern may not

reapply to the Fund because its application was denied. (Sand Decl. ¶¶ 5-7.) As such, there is no

likelihood of future harm and thus no justification for an injunction.

Moreover, Great Northern's purported harm is now monetized and could be redressed

through an action for damages, if it were to prevail. Whatever Great Northern's agenda in

bringing this lawsuit,[1] its claim for an injunction fails because any harm flowing from the denied

---

[1] The *Oregonian* has reported that Great Northern's lawsuit is bankrolled by an advocacy
nonprofit run by Edward Blum. Mike Rogoway, *Oregon Logging Company Challenges*

application could be remedied through money damages recovered from the funds The Contingent will deposit with the Court.[2]

Further, Great Northern cannot show harm through the Fund's diminution as funds are disbursed, or through the Fund's December 30, 2020 deadline, because The Contingent has offered to deposit $200,000 with the Court until the resolution of this action, which by itself eliminates the need for injunctive relief.

Because Great Northern cannot demonstrate that it will suffer irreparable harm, the Court should deny injunctive relief. (In light of the Court's order limiting the scope of the briefing, Defendants do not address the merits of Great Northern's claims or injunction motion.)

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Oregon Receives CARES Act Funds from the Federal Government; the State Emergency Board Allocates Funds within the State and Creates the Oregon Cares Fund for Black Relief and Resiliency.

On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security (CARES) Act.[3] The purpose of the CARES Act was to "provide[] *fast and direct* economic assistance for American workers, families, and small businesses, and preserve jobs for our American industries." (Davidson Ex. 2 (original emphasis).)[4]

In April 2020, Oregon received approximately $1.39 billion through the Coronavirus Relief Fund ("CRF") created by Section 5001 of the CARES Act.[5] (Davidson Ex. 3.) Pursuant to

---

*Constitutionality of State Fund to Aid Black Oregonians*, The Oregonian (Oct 30, 2020). Blum reportedly has a history of recruiting plaintiffs to his "anti-egalitarian agenda designed to further White interests." Jonathan P. Feingold, *SFFA v. Harvard: How Affirmative Action Myths Mask White Bonus*, 107 CALIF. L. REV. 707, 716 & n.45 (2019), *available at* https://lawcat.berkeley.edu/record/1129004.

[2] Sovereign immunity precludes a damages claim against the State defendants. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

[3] Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020).

[4] *Available at* https://home.treasury.gov/policy-issues/cares (accessed Nov. 11, 2020).

[5] Codified at 42 U.S.C. § 801. Pursuant to 42 U.S.C. § 801(a), Congress appropriated a total of $150 billion in CRF funds to States, Tribal governments, and units of local government.

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

Article III, Section 3 of the Oregon Constitution and ORS 291.326, the State Emergency Board was tasked with allocating a portion of these CRF funds.

On July 14, 2020, the State Emergency Board allocated over $200 million (less than 15%) of the CRF funds received by the State to assist vulnerable Oregonians and their businesses. This allocation included:

- $25.6 million in emergency assistance to small businesses with under 25 employees and which did not receive money under the Paycheck Protection Program or other provisions of the federal CARES Act;

- $50 million to support music, culture and community venues closed due to the pandemic;

- $30 million to the COVID-19 Leave Fund for workers not qualifying for traditional sick leave; and

- $35 million to fund $500 Emergency Relief Checks for those waiting for unemployment benefits; and

- $62 million to the Oregon Cares Fund for Black Relief and Resiliency "to provide economic relief to Black individuals and businesses. National and state data show that the Black community is one of the communities experiencing a disproportionate share of negative economic and health effects due to COVID-19."

(Davidson Ex. 4.) The State Emergency Board created the Oregon Cares Fund after receiving evidence that, even though COVID-19 was causing disproportionate harm in Black communities and wiping out many of the gains that Black Oregonians and their businesses made after the Great Recession, ostensibly race-neutral government aid was not reaching Black Oregonians in proportion to their suffering. (*See, e.g.,* ECF 1-2.)

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

B. **DAS Grants Funds to Defendant The Contingent, Which Administers the Oregon Cares Fund for Black Relief and Resiliency.**

This lawsuit concerns the Emergency Board's allocation of $62 million (approximately 4.5% of the State's CRF funds) to defendant Oregon Department of Administrative Services ("DAS") for a grant to defendant The Contingent, an Oregon-based non-profit with existing programs that serve Oregon's Black community. Pursuant to the Emergency Board's allocation, The Contingent is to use the granted CRF funds to establish and administer a program known as the Oregon Cares Fund for Black Relief and Resiliency (the "Fund").

Through the Fund, The Contingent has established a distribution process to grant relief to Black-owned businesses in Oregon that have been adversely affected by COVID-19. To be eligible for relief, businesses must at least (1) be based in Oregon, (2) be 51% owned by a person or people who self-identify as Black, and (3) demonstrate business interruption due to COVID-19. (Sand Decl. ¶ 2.)

C. **Great Northern Applies to the Fund and Its Application Is Permanently Denied.**

Great Northern is a logging company based in Grant County. (Dkt. 1 ¶ 21.) On October 4, 2020, Great Northern applied to the Fund. (Dkt. 1 ¶ 28.) In its application, Great Northern indicated that it had no employees but nevertheless sought $100,000 in personnel costs. (Sand Ex. 1.) It stated that none of its owners identifies as Black. (Dkt. 1 ¶ 30.)

On November 9, 2020, The Contingent denied Great Northern's application to the Fund because Great Northern failed to meet financial requirements unrelated to race. In its denial correspondence to Great Northern, The Contingent explained:

> "The Contingent has reviewed Great Northern's application for a grant from the Oregon Cares Fund and its application has been denied. Great Northern reported $100,000 of projected payroll and benefits costs no longer covered by revenues, yet Great Northern also reported that it has no employees. In addition, Great Northern had no COVID-19 related expenses for things such as PPE, cleaning, or hiring. Furthermore, Great Northern does not appear to

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

meet the U.S. Treasury Department guidelines for grants."
(Sand Decl. Ex. 1.) The Contingent was not the only CARES Act funding source to deny Great Northern's application; the Small Business Administration and Greater Eastern Oregon Development Corporation did so as well. (Dkt. 1 ¶¶ 25, 27.)

Great Northern may not reapply to the Fund now that its application has been denied. (Sand Decl. ¶¶ 5-7.)

## III.    THREATS OF FUTURE HARM AND IRREPARABLE INJURY ARE PREREQUISITE TO INJUNCTIVE RELIEF AND ARE ABSENT HERE.

"[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Thus, courts may grant a preliminary injunction only if the plaintiff shows that there is a likelihood of irreparable injury absent an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). Where, as here, a plaintiff would be made whole through monetary damages, a preliminary injunction is inappropriate. *Los Angeles Mem'l Coliseum v. Nat. Football*, 634 F.2d 1198, 1202 (9th Cir. 1980).

The crux of Great Northern's complaint is that it applied for and was denied a grant from the Fund. (Dkt. 1, ¶¶ 28-31.) Had its application as a corporate entity succeeded, the maximum grant Great Northern would have received would have been $200,000—the amount it alleges as pandemic-related losses. (*Id*., ¶ 29.) The value of its failure to secure this grant is, at most, $200,000. Such a monetary injury is not irreparable and, as described below, The Contingent has offered to pay that amount into Court.

Page 5 – DEFENDANTS' MEMORANDUM
RE IRREPARABLE HARM

Snell & Wilmer
One Centerpointe Ste 170
Lake Oswego, Oregon 97035
503.624.6800

IV.    **GREAT NORTHERN RISKS NO FUTURE INJURY BECAUSE THE CONTINGENT HAS OFFERED TO POST SECURITY IN AN AMOUNT EQUAL TO THE MAXIMUM AMOUNT GREAT NORTHERN COULD RECEIVE FROM THE FUND.**

Commensurate with this brief, The Contingent has filed a motion for leave to deposit funds with the Court in the amount of $200,000. (Dkt 17.) That amount matches Great Northern's alleged pandemic-related losses.

That deposit would vitiate Great Northern's ability to show irreparable harm. As the court noted, "the irreparable injury and need for urgency asserted by Plaintiff in its briefing is that 'the program is required to expend all funds before the end of the year.'" (Dkt. 16.) Great Northern also argues "[a]bsent injunctive relief, the Fund will be depleted" and it "will be denied the opportunity to compete for relief funds on an equal footing." Thus, although packaged as a constitutional harm, Great Northern's ability to seek injunctive relief depends on a theory of financial injury. Setting aside the fact that monetary damages are, by definition, not irreparable, The Contingent's offer to deposit funds for the amount of pandemic-related losses claimed by plaintiff covers the entirety of Great Northern's damages claim, and thus resolves any concern that funds will not be available should this Court find for Great Northern on the merits of its Complaint.

The Contingent will make the deposit using CRF funds allocated to it by the State Emergency Board. This raises the question of whether the deposited funds will automatically "expire" or otherwise be subject to recoupment by the United States Department of Treasury ("Treasury") if they remain on deposit with the Court after December 30, 2020 (the "CRF Deadline"). Provided that The Contingent undertakes certain actions by the CRF Deadline as described below, DAS believes not. The CARES Act requires that costs eligible for reimbursement with CRF funds be "incurred" by the CRF Deadline—not that the CRF funds be disbursed by that date. Specifically, the CARES Act requires that CRF funds be used:

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

> "to cover only those costs of the State…that—
>
> (1) are necessary expenditures incurred due to the public health
>
> emergency with respect to the Coronavirus Disease 2019 (COVID-
>
> 19);
>
> (2) were not accounted for in the budget most recently approved as
>
> of March 27, 2020, for the State…; and
>
> (3) *were incurred during the period that begins on March 1, 2020,*
>
> *and ends on December 30, 2020*."

42 U.S.C. § 801(d) (emphasis added). On its face, the CRF Deadline in subsection (3) only sets

the outside date by which a recipient of CRF funds must incur costs otherwise eligible for

reimbursement under subsections (1) and (2). The CARES Act does not impose any further

requirement that CRF funds actually be paid out by the CRF Deadline or any other date.

Reinforcing this reading of the CARES Act is guidance that Treasury has issued for the

benefit of CRF recipients and subrecipients. The most recent version of Treasury's CRF

guidance was issued on September 2, 2020 ("Treasury Guidance"), attached to the Davidson

Declaration as Exhibit 5, and provides in relevant part:

> Initial guidance released on April 22, 2020, provided that the cost
>
> of an expenditure is incurred when the recipient has expended
>
> funds to cover the cost. Upon further consideration and informed
>
> by an understanding of State, local, and tribal government
>
> practices, *Treasury is clarifying that for a cost to be considered to*
>
> *have been incurred, performance or delivery must occur during the*
>
> *covered period* [March 1, 2020, to December 30, 2020] *but*
>
> *payment of funds need not be made during that time (though it is*
>
> *generally expected that this will take place within 90 days of a cost*
>
> *being incurred)*. For instance, in the case of a lease of equipment

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

or other property, irrespective of when payment occurs, the cost of

a lease payment shall be considered to have been incurred for the

period of the lease that is within the covered period but not

otherwise.

\* \* \* \*

This guidance applies in a like manner to costs of subrecipients.

*Thus, a grant or loan, for example, provided by a recipient using*

*payments from the Fund must be used by the subrecipient only to*

*purchase (or reimburse a purchase of) goods or services for which*

*receipt both is needed within the covered period and occurs within*

*the covered period.*

(Davidson Ex. 5 at 2-3 (emphasis added).)

Based on the CARES Act and Treasury Guidance cited above, DAS believes that The

Contingent's deposit will remain available for payment to eligible applicants of the Fund even

after the CRF Deadline—provided that The Contingent (a) identifies eligible Fund applicants

before the CRF Deadline expires and (b) commits to pay the deposit proceeds to those eligible

applicants for those applicants' pre-CRF Deadline costs [6] if (and only if) the Court rules in favor

of Defendants, or otherwise releases any of the bond proceeds back to The Contingent. If the

Court rules that Great Northern is entitled to receive a grant in any amount from the Fund, then

the Court can disburse so much of the deposit to Great Northern as satisfies a money judgment in

Great Northern's favor, while disbursing the remainder to The Contingent for payment to the

other eligible Fund applicants identified prior to expiration of the CRF Deadline.

---

[6] In the case of the Fund, the eligible "costs" being reimbursed are certain of an applicant's
demonstrated COVID-related business losses incurred during the CRF eligibility period, March
1, 2020, through December 30, 2020. (*See* Davidson Ex. 5 at 1 (Treasury stating that eligible
expenditures "due to" the public health emergency include those "incurred to respond to second-
order effects of the emergency, such as by providing economic support to those suffering
from…business interruptions due to COVID-19-related business closures.").)

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

Finally, DAS notes that Treasury has ultimate say over whether a recipient or subrecipient has complied with the requirements of the CRF under the CARES Act. *See* 42 U.S.C. § 801(f)(1) ("The Inspector General of the Department of Treasury shall conduct monitoring and oversight of the receipt, disbursement, and use of funds made available under this section."); 42 U.S.C. § 801(f)(2) (authorizing Inspector General to recoup CRF funds from recipients). Because no Treasury Guidance speaks to the precise set of facts before the parties and Court here, there is a chance that Treasury will take a view different from DAS and conclude that the deposited funds are ineligible for disbursement after the CRF Deadline. But while the matter is not free from doubt, DAS believes that the better argument and more likely outcome is that the deposited funds will remain available for disbursement even after the CRF Deadline and so long as the conditions described above are met.

## V.    **EVEN WITHOUT THE OFFER TO DEPOSIT FUNDS, GREAT NORTHERN CANNOT SHOW IRREPARABLE INJURY OR LACK OF LEGAL REMEDIES**

### A.    **Great Northern Lacks Standing to Seek a Preliminary Injunction. Its Application to the Fund Was Denied and It Cannot Reapply, So It Cannot Demonstrate Likely Future Injury.**

A plaintiff must demonstrate constitutional standing separately for each form of relief requested. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 185 (2000). As such, a party seeking injunctive relief must satisfy the threshold requirement of Article III standing by alleging an actual case or controversy,[7] and must also establish that it is "likely to suffer future injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 105 (1983). Great Northern lacks standing to seek injunctive relief because the denial of its application to the Fund cuts off future injury.

---

[7] Given the Court's instructions to limit this memorandum to irreparable harm in the context of a preliminary injunction, Defendants do not here address any other deficiencies in Great Northern's Article III standing to bring this lawsuit.

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

The purpose of an injunction is to prevent future violations against the party seeking it. *United States v. W. T. Grant Co*., 345 U.S. 629, 633 (1953) (citing *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928)). An injunction is not available to address a past or completed harm. *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations."); *Cutting v. Down E. Orthopedic Assocs., P.A.*, 278 F. Supp. 3d 485, 497 (D. Me. 2017) (holding that "an injunction is intended to forestall future violations, not to punish past ones"). Thus, "[p]ast wrongs" are "insufficient by themselves to grant standing" where a party seeks injunctive relief. *Davidson v. Kimberly-Clark Corp*., 889 F.3d 956, 967 (9th Cir. 2018). "Where standing is premised entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that he will again be wronged in a similar way.'" *Id*. (quoting *Lyons*, 461 U.S. at 111); *see also W. T. Grant Co*., 345 U.S. at 633 (holding that the "necessary determination is that there exists some cognizable danger of recurrent violation").

Indeed, "[a]bsent a sufficient likelihood that he will again be wronged in a similar way," a party is "no more entitled to an injunction than any other citizen…." *Lyons*, 461 U.S. at 111; *see also Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999) (plaintiff with standing to pursue damages does not necessarily have standing to request injunctive or declaratory relief). Even when it has suffered a specific past injury, a plaintiff seeking an injunction must show a "real or immediate threat" that the plaintiff *itself* will suffer it again in the immediate future. *See, e.g.*, *Updike v. Multnomah Cty.*, 870 F.3d 939, 947-48 (9th Cir. 2017) (plaintiff lacked standing for injunctive relief where evidence was "insufficient to establish that any such wrongful behavior is likely to recur against him"); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (plaintiff seeking declaratory or injunctive relief must "establish a personal stake" in the requested relief).

Great Northern cannot demonstrate standing to seek a preliminary injunction because it faces no recurring or future harm. Great Northern has requested a preliminary injunction to "halt

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

the State's use of race as an essential factor in the grant process" in distributing money from the Fund. (Dkt. 12-1 at 1; *see also* Dkt. 1 at 14, ¶ 4.) But Great Northern's application has already been denied and it may not apply again. (Sand Decl. ¶¶ 5-7 & Ex. 1.) As such, Great Northern's application process has concluded and it cannot establish that it likely will (or even can) suffer future purported injury in a similar way.

Further, to the extent Great Northern purports to seek an injunction to direct the Fund's distribution of money going forward, it lacks standing to do so because it has no stake in other future-filed applications—only in its own, which has been denied. *See Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1996) (recognizing that "[p]rudential limitations on standing require that parties assert their own rights rather than rely on the rights or interests of third parties").

Great Northern, which may not submit another application because it already has been denied, cannot show a sufficient likelihood that it would be harmed in a "similar way." In other words, Great Northern lacks standing to seek preliminary injunctive relief because, to the extent Great Northern suffered any actual harm, it was a past, completed harm that a preliminary injunction cannot prevent.

**B.**     **The Court Should Reject Great Northern's Argument that a Generalized Assertion of Constitutional Harm Satisfies the Requirement of Showing a Realistic Possibility of Future Injury to Great Northern.**

In order to avoid the principle that quantifiable, monetized harm is not irreparable, Great Northern contends that the mere assertion of a potential constitutional violation justifies injunctive relief because constitutional violations are *per se* irreparable. (Dkt. 12-1 at 14-15.) Great Northern is mistaken to equate assertion of any constitutional violation with an entitlement to preliminary injunctive relief.

To be sure, a movant's demonstration (through evidence) of ongoing or repeated deprivation of its constitutional rights "generally" constitutes irreparable injury. *Nelson v. NASA*,

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

530 F.3d 865, 882 (9th Cir. 2008); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). But the Court must consider an assertion about the merits (was there a constitutional violation?) separately from whether there is irreparable injury (is there a likelihood of the asserted constitutional violation recurring in the future?). The four factors the Court considers on a motion for preliminary injunction do not "collapse into the [single issue of] merits." *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("Though '[b]y bringing a colorable First Amendment claim, [the movant] certainly raises the specter of irreparable injury,' 'simply raising a serious [First Amendment] claim is not enough to tip the hardship scales.'" (citing *Paramount Land Co. LP v. California Pistachio Comm'n*, 491 F.3d 1003, 1012 (9th Cir. 2007)). As one court has explained, "plaintiffs must demonstrate some likely irreparable harm in the absence of a preliminary injunction barring the challenged action, and not simply a constitutional violation." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 925 (N.D. Cal. 2019), *aff'd*, 963 F.3d 874 (9th Cir. 2020), *cert. granted sub nom.*, No. 20-138, 2020 WL 6121565 (U.S. Oct. 19, 2020).

Or, put another way, "irreparable injury is not automatically presumed merely because a constitutional violation is alleged." *Columbia Sussex Mgmt., LLC v. City of Santa Monica*, No. 2:19-CV-09991-ODW (SKx), 2019 U.S. Dist. LEXIS 218226, at *9 (C.D. Cal. Dec. 18, 2019). A movant still needs to show it is realistic that the movant will actually suffer that purported injury *in the future. See, e.g., Melendres v. Arpaio*, 695 F.3d 990, 997 (9th Cir. 2012) (holding that to have standing to assert a claim for prospective injunctive relief, a plaintiff must demonstrate "that he is realistically threatened by a repetition of the violation").

Indeed, Great Northern's cited own cases illustrate that requirement well. (*See* Dkt. 12-1 at 15.) The crux of these cases is that, unlike here, the plaintiffs were at risk for repeated or continued violations of their constitutional rights. For example, in *Melendres*, 695 F.3d 990 at 1002, the Ninth Circuit affirmed an order granting a preliminary injunction where Joe Arpaio's infamous sheriff's office detained individuals solely because of their immigration status and

Snell & Wilmer
One Centerpointe Dr Ste 170
Lake Oswego, Oregon 97035
503.624.6800

plaintiffs "faced a real possibility that they would again be stopped or detained and subject to unlawful detention."

Similarly, in *Hernandez v. Sessions*, 872 F.3d 976, 990-91(9th Cir. 2017), the Ninth Circuit affirmed an order granting a preliminary injunction requiring immigration officers to consider additional factors where the detained plaintiffs were denied a fair opportunity for release in violation of the Due Process Clause of the Fifth Amendment. *See also Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (employees threatened with discharge for failing to support the Democratic party); *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-58 (9th Cir. 2009) (irreparable harm where motor carriers faced "Hobson's choice": comply with a likely unconstitutional law or face irreparable business disruption).

Great Northern also contends that not "competing on equal footing in a contracting process constitutes irreparable harm standing on its own." (Dkt. 12-1 at 15.) The cases Great Northern cites on page 15 of its motion show why a preliminary injunction is inappropriate here. *O'Donnell Construction Co. v. D.C.*, 963 F.2d 420 (D. C. Cir. 1992), might be the most illustrative among those cases. There, the D.C. Circuit found a contractor demonstrated irreparable harm because it "has little hope of obtaining 'adequate compensatory or other corrective relief at a late date' if the injunction does not issue." *Id.* at 428. If that contractor later won on the merits without an injunction, then it would have to show "which prime contracts and subcontracts it would have received in the absence" of the invalidated rules and how much profit it would have made on each of those contracts. The Court thus concluded "[t]he difficulty of such inherently speculative showing weighs heavily in favor of granting the injunction," especially in light of a strong showing on likelihood of success. *Id.* at 428-29. Here, that dynamic is absent because any alleged injury has already been fully incurred. Unlike *O'Donnell*, the contracting process here has run its course and, because reapplication after denial is not permitted, there is no future "speculative" harm that can be avoided by injunctive relief.

Several other cases central to Great Northern's argument are inapposite. In *Monterey*

Page 13 – DEFENDANTS' MEMORANDUM
RE IRREPARABLE HARM

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

*Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997), the Ninth Circuit did not order the grant of a preliminary injunction, but simply remanded to the district court to determine whether a preliminary injunction would be appropriate after finding a statute violated the Equal Protection Clause. In *City of Los Angeles v. Sessions*, 2019 WL 1957966 (C.D. Cal. Feb. 15, 2019), the propriety of a preliminary injunction was not at issue. Rather, the district court ordered a permanent injunction after finding that the U.S. Department of Justice's new conditions on its grants, which required the city to cooperate with federal immigration officials, "upset the constitutional balance between state and federal power." *Id*. at *1, *5. Likewise, in *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs*., 337 F. Supp. 3d 308, 342 (S.D.N.Y. 2018), the court granted a *permanent injunction* after finding the U.S. Department of Health and Human Services' changes to grants given through the Teen Pregnancy Prevention Program were arbitrary and capricious and contrary to the congressional mandate for the Program. *Id*. at 330-31, 342-43. For these reasons, the Court should reject Great Northern's assertion that it is likely to suffer ongoing harm.

## VI.    <u>CONCLUSION</u>

Defendants respectfully request that the Court deny Great Northern's motion for preliminary injunction for lack of irreparable harm.[8] Great Northern's alleged harm is in the past and can be redressed with the money The Contingent has offered to deposit. The preliminary injunction Great Northern would not help that company; its application has been denied on bases other than race and Great Northern cannot reapply. Further, should Great Northern prevail, funds

/ / /

/ / /

/ / /

/ / /

---

[8] Defendants reserve the right to oppose that motion on additional grounds at a later time and consistent with the Court's directives.

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

adequate to cover the pandemic-related losses it claimed will reside with the Court. Because no urgency exists, this case can move forward in the ordinary course.

Dated: November 13, 2020                    ELLEN ROSENBLUM
                                            ATTORNEY GENERAL
                                            FOR THE STATE OF OREGON

                                            By  /s/ Clifford S. Davidson
                                                Clifford S. Davidson, OSB No. 125378
                                                csdavidson@swlaw.com
                                                *Special Assistant Attorney General
                                                for Defendants Katy Coba and Oregon
                                                Department of Administrative Services*

                                                Fay Stetz-Waters, OSB No. 071789
                                                Fay.stetz-waters@doj.state.or.us
                                                Sheila H. Potter, OSB No. 993485
                                                Shiela.potter@doj.state.or.us

                                                *Of Attorneys for Defendants Katy Coba, in
                                                her Official Capacity as State Chief
                                                Operating Officer and Director of the
                                                Oregon Department of Administrative
                                                Services; and Oregon Department of
                                                Administrative Services*

                                            SCHWABE, WILLIAMSON & WYATT, P.C.

                                            By  /s/ Amanda Gamblin
                                                Amanda Gamblin, OSB #021361
                                                Email: agamblin@schwabe.com
                                                Nika Aldrich, OSB #160306
                                                Email: naldrich@schwabe.com
                                                Facsimile: 503-796-2900

                                                *Of Attorneys for Defendant The Contingent*

4836-9015-2658

Page 15 – DEFENDANTS' MEMORANDUM
         RE IRREPARABLE HARM

Snell & Wilmer
One Centerpointe Ste 170
Lake Oswego, Oregon 97035
503.624.6800