BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK*
STEPHEN M. DUVERNAY*
400 Capitol Mall, Suite 2530
Sacramento, CA  95814
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

MITCHELL LAW PLLC
JONATHAN F. MITCHELL*
111 Congress Avenue, Suite 400
Austin, TX  78701
Telephone: (512) 686-3940
jonathan@mitchell.law

MURPHY & BUCHAL LLP
JAMES L. BUCHAL
3425 SE Yamhill Street, Suite 100
Portland, OR  97214
Telephone: (503) 227-1011
jbuchal@mbllp.com

*Admitted *pro hac vice*

Counsel for Plaintiffs and the Proposed Class

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| GREAT NORTHERN RESOURCES, INC., DYNAMIC SERVICE FIRE AND SECURITY, LLC, and WALTER VAN LEJA, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KATY COBA, in her Official Capacity as State Chief Operating Officer and Director of the OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES; OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES; THE CONTINGENT; BLACK UNITED FUND OF OREGON and DOES 1-10,<br><br>Defendants. | Case No.:  3:20-cv-01866-IM (Lead Case)<br>Case No.:  3:20-cv-02022-IM (Trailing Case)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**<br><br>**EXPEDITED HEARING REQUESTED** |

## I.  INTRODUCTION

The plaintiffs have amended their complaint to assert class-action claims against Oregon's illegal use of strict race-based criteria for distributing money from the Oregon Cares Fund for Black Relief and Resiliency (the "Fund").  Grants from the Fund are available only to individuals and business owners who "self-identify as Black."  This express use of race in distributing government money violates the Equal Protection Clause and federal anti-discrimination statutes.

The representative plaintiffs include two small, family-run businesses and one individual that have been adversely affected by the pandemic, and they seek relief on behalf all individuals, families, and businesses in Oregon who have been disqualified from relief from the Fund on account of their race.  The pandemic's harm to the plaintiffs and their fellow class members should allow them to compete in any government-aid program, yet they are excluded from seeking financial relief from the Fund solely on the basis of race.

The defendants previously escaped a preliminary injunction by posting a bond sufficient to cover the claims for damages asserted by individual plaintiffs.  No such maneuver is possible when the plaintiffs are suing as class representatives and demanding classwide injunctive relief and damages.  Accordingly, the plaintiffs seek a temporary restraining order or preliminary injunction to halt the illegal racial exclusions that the defendants are imposing on this Covid-relief money.  Time is of the essence:  Consistent with restrictions imposed by the federal government through the CARES Act, all funds allocated to the program must be expended by December 30, 2020.

## II.  FACTUAL BACKGROUND

A.    **The Oregon Legislature Established The Fund To Provide Coronavirus Relief Grants On The Basis Of Race**

On July 14, 2020, the Oregon Legislature's Joint Emergency Board approved a $62 million grant to establish the Fund, using money allocated to the state by the federal government from the CARES Act's $150 billion Coronavirus Relief Fund.  *See* Duvernay Decl., Ex. 1,

Oregon State Leg. Joint Emergency Bd., Leg. Fiscal Office Analysis, Agenda Item 3: Oregon Cares Fund for Black Relief and Resiliency (July 14, 2020) ("Cares Fund Agenda Report"). The Fund is a grant program overseen by Defendant Oregon Department of Administrative Services ("DAS")[1] and administered by two Oregon-based community organizations (The Contingent and the Black United Fund of Oregon) that are responsible for reviewing applications and making funding decisions. *See id.*

The Legislature established the Fund by providing a $62 million grant to The Contingent. Cares Fund Agenda Report at p. 1. DAS is "responsible for transmitting the [grant] funds and working with The Contingent on ensuring that federal spending, reporting, and other legal requirements are met, including that the funds are expended by December 30, 2020." *Id.* at p. 2. The Contingent is responsible for managing business grants from the Fund, and the Black United Fund of Oregon is responsible for managing grants to individuals. *Id.* at p. 1.

The Fund is explicitly targeted at providing relief to the "Black community" to support "Black relief and resiliency." Cares Fund Agenda Report at p. 1. The Fund's website includes a video that describes the Fund this way: "This is a fund that was designed for and by black people in the State of Oregon to help us deal with these Covid-19 realities. It is for businesses, individuals, and civic organizations. This is an unprecedented step for parity and equity for people of color – black people – in the State of Oregon." The Oregon Cares Fund for Black Relief + Resiliency, *Frequently Asked Questions*, https://www.theoregoncaresfund.org/faqs-1 ("Fund Website FAQ Video").[2]

To be eligible for grant funds, individuals, families, and businesses must (1) live in or be based in Oregon, (2) demonstrate hardship due to Covid-19, and (3) "self-identify as Black."

---

[1] DAS is the central administrative agency of the Oregon state government, which implements the policy and financial decisions made by the Governor and Oregon Legislature. Or. Rev. Stat. § 184.305; *see* Oregon Dep't of Admin. Servs., *Administrative Overview* (Jan. 2014).

[2] The Contingent has uploaded the video to Vimeo, *The Oregon Cares Fund for Black Relief + Resiliency, Information & Application Guide Video*, https://vimeo.com/470054764.

Cares Fund Agenda Report at p. 1. Individuals and families are eligible to receive grants up to $3,000, and businesses can receive up to $100,000 in grants. *Id.*

As part of the application process, businesses, individuals, and families seeking grants from the Fund must state whether they "identify" as black – and funding decisions are based on whether applicants satisfy this threshold criteria. Cares Fund Agenda Report at p. 2. For businesses, the Fund's website emphasizes that "in order to qualify for the Fund you have to be at least 51% black owned. That's important." Fund Website FAQ Video.

Consistent with restrictions imposed by the federal government through the CARES Act, all funds allocated to the grant program must be expended by December 30, 2020. Cares Fund Agenda Report at p. 2.

### B. Each Of The Representative Plaintiffs Has Suffered Adverse Economic Effects From The Covid-19 Pandemic

The representative plaintiffs include two small, family-run businesses and one individual that have been adversely affected by the Covid-19 pandemic.

*Great Northern Resources*. Great Northern is a small, family-run logging company based in Grant County. Dkt. 12-2, Houpt Decl., ¶ 2. The focus of Great Northern's business is selective harvesting and timber salvage, along with thinning and fuel reduction, on privately owned and federally managed lands in Grant County, and then selling merchantable timber to local sawmills. *Id.* Like many small businesses around the state, Great Northern's business has suffered during the pandemic. *Id.* ¶¶ 3–4. After more than seven months of slow operations, the company has exhausted its modest operating capital reserves and company revenue is far eclipsed by its costs and expenses. *Id.* ¶ 4.

On October 4, 2020, Great Northern submitted a grant application to the Fund through the Contingent's website. Dkt. 12-2, Houpt Decl., ¶ 9. As part of the application, Great Northern described the pandemic's impact on its business. *Id.* Great Northern also submitted financial details showing that its revenue has plummeted in 2020, and that the company projected a substantial loss for the year. *Id.* Finally, the application asked: "What percentage of

owners of this business identify as Black?" *Id.* Great Northern answered "0." *Id.* After Great Northern sued to enjoin the defendants from enforcing this racial exclusion, The Contingent quickly denied Great Northern's application on November 9 and told Great Northern that it was forbidden to reapply. Dkt. 21-2, Houpt Decl. ISO Continuing and Irreparable Injury, ¶ 3; Dkt. 19, Sand Decl., ¶ 4 & Ex. 1.

*Dynamic Service Fire and Security, LLC.* Dynamic Service is a low-voltage electrical contractor based in Salem. Leja Decl., ¶ 2. It installs and repairs fire-alarm systems, access controls, telephone entry, and low-voltage telephone and cables in apartment buildings throughout the state. *Id.* The pandemic has devastated Dynamic Service's business. *Id.* ¶¶ 4–6. The company's gross revenues have declined precipitously from pre-pandemic levels due to lost business opportunities and clients falling behind on their payments. *Id.* ¶ 4. In January and February of 2020, Dynamic Service grossed around $40,000 each month; now it takes in between $10,000 and $18,000 of gross monthly income. *Id*. Pandemic-induced shutdowns have also made supplies more difficult and costly to obtain. *Id.* ¶ 5. The company has also incurred costs due to pandemic regulations and the acquisition of personal protective equipment and cleaning supplies. *Id.* ¶ 6. While the company's costs have increased, the number of available jobs has substantially decreased. *See id*. ¶ 4.

In response to these financial challenges, Dynamic Service has borrowed over $75,000 and maxed out its credit cards at $30,000. Leja Decl., ¶ 7. It obtained a loan for $20,040 from the Paycheck Protection Program. *Id*. The company also sought access to the State of Oregon's $20 million small business grant program, but demand was so high that the program stopped accepting applications soon after it opened. *Id*. ¶ 8.

Dynamic Service's owners do not identify as black. Leja Decl., ¶ 11. The company intends to apply and will apply for relief from the Fund if and when the courts enjoin the enforcement of the racial exclusions that render Dynamic Service ineligible for relief. *Id*.

*Walter Van Leja.* Mr. Leja has suffered significant harm to his personal finances on account of Covid-19. Leja Decl., ¶ 9. His personal income is derived from his family-owned

company, Dynamic Service, which has been devastated by the pandemic as detailed above. *Id.* Mr. Leja and his wife have had to take a six-month forbearance on their mortgage, which will force them to make higher monthly mortgage payments in the future. *Id.* Yet Mr. Leja's monthly personal income remains far below its pre-pandemic levels. *Id.* ¶¶ 9-10.

Mr. Leja wishes to apply for individual and family relief from the Fund, but he is ineligible for this relief because he is not black. Leja Decl., ¶ 12. Mr. Leja intends to apply and will apply for individual and family relief from the Fund if and when the courts enjoin the enforcement of the racial exclusions that render Mr. Leja and his family ineligible for relief. *Id.*

### III.  PROCEDURAL BACKGROUND

On October 29, 2020, Plaintiff Great Northern filed the original complaint in this action, naming as defendants The Contingent, DAS, and Katy Coba (Chief Operating Officer and Director of DAS) in her official capacity. It asserted claims under the Equal Protection Clause and 42 U.S.C. § 1981, and a claim for violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d).

Great Northern moved for a temporary restraining order or preliminary injunction. Dkt. 12. The Court denied the motion, holding that Great Northern had failed to prove irreparable harm. In the Court's view, Great Northern's "harm was in the past" because its application to the Fund had already been denied. Dkt. 27, Op and Order Denying TRO or Preliminary Injunction, at p. 3. In addition, the Court ordered The Contingent to deposit $200,000 to ensure that Great Northern could be "fully compensate[d] . . . for its injury" if it ultimately prevailed in the litigation. *Id.* at p. 7; *see also* Dkt. 26 (Order to Deposit Funds). That same day, another business filed a lawsuit challenging the legality of the Fund's racial exclusions. *Cocina Cultura LLC v. Coba*, Case No. 3:20-cv-02022-IM. The Court denied Cocina Cultura's request for a preliminary injunction when The Contingent offered to post a similar bond in that case. Dec. 7, 2020 Op. and Order, Case No. 3:20-cv-02022-IM, Dkt. 36.

On December 6, plaintiffs amended their complaint, adding Dynamic Service and Mr. Leja as plaintiffs and seeking classwide relief on behalf of all current and future individuals,

families, and businesses who: (1) live or are based in Oregon; (2) have experienced or are experiencing hardship due to Covid-19; and (3) do not self-identify as black, and who therefore have been or are currently being disqualified from relief from the Fund on account of race. Dkt. 32.

On December 8, the Court issued an order consolidating this case with the *Cocina Cultura* case. Dkt. 35.

## IV.  ARGUMENT

"In deciding whether to grant a motion for a temporary restraining order ('TRO'), courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction." *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 (D. Or. 2016); *see also Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (a court's "analysis is substantially identical for [an] injunction and [a] TRO").  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).  Alternatively, injunctive relief "is appropriate when a plaintiff demonstrates that serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (ellipsis omitted).

**A.**  **The Representative Plaintiffs And Their Fellow Class Members Are Likely To Establish That Defendants' Use Of Race To Distribute Grants From The Fund Violates The Equal Protection Clause**

The Equal Protection Clause provides that, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amdt. 14, § 1.  "[T]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017) (quoting

*McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)). "Laws that explicitly distinguish between individuals on racial grounds fall within the core of [the Fourteenth Amendment's] prohibition." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). "'[A]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007) (plurality opinion of Roberts, C.J.) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)) (internal citation omitted). Put simply, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (citation omitted).

"[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice [a] plaintiff." *Parents Involved*, 551 U.S. at 719 (plurality opinion of Roberts, C.J.) (citing *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 211 (1995); and *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)). "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors*, 515 U.S. at 227. Under strict scrutiny, the government has the burden of proving that racial classifications "are narrowly tailored measures that further compelling governmental interests." *Id.* "The reasons for strict scrutiny are familiar. Racial classifications raise special fears that they are motivated by an invidious purpose. Thus, [the Supreme Court has] admonished time and again that, '[a]bsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining . . . what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Johnson v. California*, 543 U.S. 499, 505–06 (2005) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)).

1.  **The Defendants' Use Of Race As An Essential Factor In Distributing Government Benefits Fails Strict Scrutiny**

The representative plaintiffs and their fellow class members would be qualified to receive a grant from the Fund – as Oregon-based businesses and Oregon residents that have experienced or are experiencing hardship due to Covid-19 – but for the fact they are not black-owned businesses or black individuals. The defendants' use of race as the qualifying factor in distributing grants from the Fund fails strict scrutiny. It is not based on a compelling interest, nor is it narrowly tailored. *Adarand*, 515 U.S. at 227.

The Supreme Court has stated repeatedly that addressing past societal discrimination is not a compelling interest. "[G]eneralized assertion[s]" of past discrimination cannot justify remedial race-based action because they "provide[] no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy. It 'has no logical stopping point.'" *J.A. Croson Co.*, 488 U.S. at 498 (quoting *Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 275 (1986) (opinion of O'Connor, J.)). Likewise, "[a] generalized assertion of past discrimination in a particular . . . region is not adequate because it 'provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.'" *Shaw v. Hunt*, 517 U.S. 899, 909 (1996) (citation omitted); *see also J.A. Croson Co.*, 488 U.S. at 499 ("an amorphous claim" of past discrimination insufficient to justify race-based quota system).

Precisely because "[r]acial classifications are antithetical to the Fourteenth Amendment," the Supreme Court has placed strict constraints on a state's use of racial distinctions. *Shaw*, 517 U.S. at 909. When a state seeks to "remedy[] the effects of past or present racial discrimination," it "must satisfy two conditions" to establish a "compelling state interest." *Id*. First, the discrimination must be "'identified discrimination'" – a state "must identify" discrimination "with some specificity." *Id.* (quoting *J.A. Croson Co.*, 488 U.S. at 504). Second, a state "must have had a 'strong basis in evidence' to conclude that remedial action was necessary, '*before* it embarks'" on race-conscious action. *Shaw*, 517 U.S. at 909 (citations omitted; emphasis in *Shaw*); *J.A. Croson Co.*, 488 U.S. at 500 (there must be a "strong basis in evidence" to

demonstrate the necessity of racial classifications, and "simple legislative assurances of good intention cannot suffice").[3]

But the Oregon Legislature did precisely what the Supreme Court has said it cannot do: It established the Fund based upon claims of generalized discrimination. The Joint Emergency Board's scant legislative record focuses broadly on general notions of past and present societal discrimination. *See* Multnomah County Board of County Commissioners, *Letter in Support of The Oregon Cares Fund* (July 10, 2020) (arguing that "Oregon's (and the country's) racist history has created a present in which Black Oregonians have been disproportionately impacted by the COVID pandemic," and claiming that "The Oregon Cares Fund would address this disproportionate impact by providing direct funding to Black individuals and families, Black-led businesses, and Black-owned organizations."); Washington County Administrative Office, *Letter RE: Emergency funding for the Oregon Cares Fund for Black Relief and Resiliency* (July 13, 2020) ("We join the call for accountability and concrete change to end racial injustice and the brutality that it gives rise to. We support the movement to dismantle systemic racism. We know that systemic racism contributes to economic, social, and health disparities that directly impact our county. [¶] We must, therefore, become an active part of the remedy. We are writing to respectfully urge you to support the Funding of the Oregon Cares Fund for Black Relief and Resiliency.").[4]

---

[3]   In fact, the legislative record confirms that the Joint Emergency Board was aware of the need to develop an evidentiary basis before establishing a race-based grant program. In connection with Oregon's consideration of race- or gender-based Covid-relief programs, the state's Legislative Counsel warned that "[w]ithout any [evidentiary] findings, the [grant] program would almost certainly be unconstitutional under the Fourteenth Amendment," and opined that "in order for [the agency] to constitutionally operate the grant program, [it] would first need to develop evidence of past discrimination." Duvernay Decl., Ex. 2, Oregon Leg. Counsel Comm., *Letter Re: Allocation of moneys based on race and gender classifications* (July 13, 2020), p. 2. This letter was included in the Joint Emergency Board's materials for the July 14 meeting when it approved the Fund, but the Board appears to have ignored the warning.

[4]   The letters from Multnomah and Washington Counties are attached as Exhibits 3 and 4 to the Declaration of Stephen M. Duvernay.

The legislative analysis briefly mentions that "National and state data show that the Black community is one of the communities experiencing a disproportionate share of negative economic and health effects due to COVID-19," referencing a single draft report from an economist at the National Bureau of Economic Research. Cares Fund Agenda Report, at p. 1.[5] Even accepting as true the unfortunate circumstance that members of the black community have been disproportionately impacted by the pandemic, this is not a form of "discrimination" that can be remedied by a race-based program. In any event, the promoters of the Fund tied this disparate impact from the pandemic to generalized conditions by asserting that the pandemic has "widen[ed]" pre-existing "gaps" due to "400 years" of prior societal discrimination. Duvernay Decl., Ex. 5, Oregon State Leg. Joint Emergency Bd., July 14, 2020 Meeting Materials, Ex. 9, Testimony – The Oregon Cares Fund, *The Oregon Cares Fund: A Fund For Black Relief And Resiliency*, p. 3 of exhibit (labeled as page 8) ("Oregon Cares Fund Overview"). But "remedying past societal discrimination does not justify race-conscious government action." *Parents Involved*, 551 U.S. at 731 (opinion of Roberts, C.J.); *Shaw*, 517 U.S. at 909–10 ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest"); *see also Wygant*, 476 U.S. at 276 (plurality opinion) ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy."); *id*. at 288 (opinion of O'Connor, J.) (agreeing with plurality that "a governmental agency's interest in remedying 'societal' discrimination . . . cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny").

The materials presented to the Legislature in support of the Fund further demonstrate that it was conceived as an impermissible means of remedying past societal discrimination. The Fund's proponents put general societal discrimination front and center in the materials they submitted to the Joint Emergency Board:

---

[5] The report is Robert W. Fairlie, NBER Working Paper 27309, *The Impact of COVID-19 On Small Business Owners: Evidence of Early-Stage Losses From The April 2020 Current Population Survey*, Nat'l Bureau of Econ. Research (June 2020), online at https://www.nber.org/papers/w27309.pdf.

> The Black community across Oregon is in the midst of two pandemics. The first is this country's 400 years of racial violence and strategic divestment from the Black community, deepened here in Oregon through intentional policy and practice. More recently, it is the Covid-19 pandemic that is widening the gaps between the average white Oregonian and the average Black Oregonian. This gap must be narrowed through targeted investment in our community—**for Black people, for Black-owned businesses, and for Black community based organizations.** And that narrowing includes **The Oregon Cares Fund. The Oregon Cares Fund (TOCF) is a $62 million targeted investment in the Black community from the CARES Act's Coronavirus Relief Fund (CRF).**
>
> <u>**Historic Disparities**</u>
>
> The myriad of issues requiring remedy prior to and exacerbated by the COVID-19 pandemic are institutional, and cannot be mitigated through one singular effort or fund. Black people began this pandemic far behind the average Oregonian whether it is in health, education, or economic prosperity. . . . Immediate intervention is necessary to enable the Black community to meet basic needs and help us begin to chart a course for our collective recovery.

Oregon Cares Fund Overview, p. 3 of exhibit (labeled as page 8) (emphasis in original).

Because Oregon did not link the grant program to specific, "identified discrimination," the defendants cannot establish that the program furthers a compelling state interest – and it is therefore "almost impossible" to conduct a narrow-tailoring inquiry. *J.A. Croson Co.*, 488 U.S. at 507. The Legislature's superficial analysis confirms that defendants cannot meet their burden of showing that the use of race to distribute grants is narrowly tailored. Among other things, narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 206, 339 (2003); *see also J.A. Croson Co.*, 488 U.S. at 507 (minority set-aside program was not narrowly tailored in part because city had not considered "the use of race-neutral means" to achieve its interest); *Wygant*, 476 U.S. at 280 n.6 (plurality opinion) (noting that the term "narrowly tailored" "require[s] consideration" of "lawful alternative and less restrictive means"). But here, the Oregon Legislature gave no consideration of race-neutral alternatives – it just established a grant program that is reserved for members of a particular race.

This record demonstrates that the defendants' use of race as a basis for eligibility for Fund grants cannot satisfy strict scrutiny. The Legislature failed to identify discrimination with specificity and failed to develop a "strong basis" of evidence before taking race-conscious action.

*Shaw*, 517 U.S. at 910.  The legislative record shows that the Fund is an attempt to address general societal discrimination.  Accordingly, the use of race as the basis for distributing grants from the Fund violates the Constitution's Equal Protection guarantee.

### 2. DAS, The Contingent, And Black United Fund Are Jointly Liable Under 42 U.S.C. § 1983

As set forth above, DAS is the agency responsible for implementing the Fund, which included transmitting $62 million in federal relief funds to the Contingent to establish the Fund, and "working with The Contingent on ensuring that federal spending, reporting, and other legal requirements are met."  Cares Fund Agenda Report at p. 2.  This includes ensuring that the Fund satisfy the Oregon Legislature's directive that grant recipients meet the "[s]pecific requirement[]" that they "self-identify as Black."  *Id.* at p. 1.

The Contingent and Black United Fund are jointly engaged with DAS to administer the Fund and are charged by the Oregon Legislature to distribute grants on the condition that recipients "self-identify as Black."  The Contingent and Black United Fund are therefore liable as state actors for the purposes of 42 U.S.C. § 1983 because the Oregon Legislature "create[d] the legal framework governing [the Contingent's and Black United Fund's] conduct," "delegate[d] [the state's] authority" to the Contingent and Black United Fund to deploy race-based classifications when overseeing the Fund, and generally "provided a mantle of authority" to the Contingent and Black United Fund such that the organizations are acting as the state itself when distributing grants from the Fund.  *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

\*  \*  \*

The defendants, acting under color of state law, have used race as an essential factor in considering applications and distributing grants from the Fund, *i.e.*, applicants must "self-identify as Black" to be eligible.  By distributing government benefits on the basis of race, the defendants have denied and continue to deny the plaintiffs and their fellow class members of the opportunity to compete on an equal basis for a coronavirus relief grant from the Fund, in

violation of the Equal Protection Clause. Accordingly, the plaintiffs have established a probability of prevailing on their Equal Protection claim.

B.  **The Representative Plaintiffs And Their Fellow Class Members Are Also Likely To Establish That Defendants' Conduct Violates Title VI Of The Civil Rights Act and 42 U.S.C. § 1981**

The defendants' intentional discrimination against the plaintiffs and the class also violates federal antidiscrimination statutes, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., and 42 U.S.C. § 1981. Title VI states that "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To state a claim under Title VI, "a plaintiff must allege that (1) the entity involved is engaging in race discrimination; and (2) the entity involved is receiving federal financial assistance." *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), overruled on other grounds, *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1133 (9th Cir. 2001). The facts set out above establish both requirements.

Section 1981 prohibits racial discrimination in the making and enforcement of contracts, and it applies to both the government and private actors. 42 U.S.C. § 1981(a), (c). The statute is "meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295–96 (1976)). Among other things, section 1981 "prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms." *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–77 (1989). Businesses applying to the Fund must attest and confirm that they "agree to the conditions of this application," which include, among other things, assurances that funds will only be used for certain types of expenses. Duvernay Decl., Ex. 6, Oregon Cares Business And Nonprofit Application, Attestation.

For the same reasons that the defendants have violated the Equal Protection Clause, their intentional discrimination against the representative plaintiffs and their fellow class members violates both of these provisions of federal antidiscrimination law, which are at least coextensive with the Equal Protection Clause.  The Supreme Court has "explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI [of the Civil Rights Act of 1964]." *Gratz*, 539 U.S. at 276 n.23.  Similarly, "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate [42 U.S.C.] § 1981." *Id.*; *see also Grutter*, 539 U.S. at 343 (noting that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"); accord *Assoc. Gen. Contractors of Cal. v. Coalition for Econ. Equality*, 950 F.2d 1401, 1412 n.8 (9th Cir. 1991).

C.  **The Representative Plaintiffs And Their Fellow Class Members Will Be Irreparably Harmed Without Injunctive Relief**

The plaintiffs and the class members will suffer irreparable harm absent a preliminary injunction. As the Ninth Circuit has repeatedly emphasized, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, (1976)); *see Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) (same).  "[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted).

And a court considering a preliminary injunction must consider irreparable harm that will be inflicted upon putative class members, even if the class has not yet been certified.  "[W]hen a plaintiff requests preliminary injunctive relief before class certification has been decided, a court may consider the harm to the putative class and grant classwide appropriate preliminary injunctive relief to preserve the status quo, particularly when . . . there is alleged classwide harm and conduct aimed at a class of persons." *Doe v. Trump*, 418 F. Supp. 3d 573, 603 (D. Or. 2019)

(collecting cases). *See, e.g.*, *Joyce v. City & Cty. of San Francisco*, 846 F. Supp. 843, 854 (N.D. Cal. 1994) ("Since a determination has not yet been made whether plaintiffs can proceed as a class, it is appropriate at this stage that the Court considers the injuries alleged to the individuals within the entire proposed class."); *Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1044–45 (E.D. Mich. 1994) ("[T]he court will take into consideration the irreparable harm faced by putative class members before class certification because of the nature of injunctive relief at this stage of the litigation."); *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 990 (D. Minn. 2006) ("Because Plaintiffs have brought this action on behalf of themselves and all others similarly situated, it is appropriate for the Court to consider the threat of irreparable harm to the putative class members."); *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1164 (C.D. Cal. 2018) (granting a classwide injunction before certification when "an injunction is necessary to forestall harm to putative class members that is likely to transpire before the parties can litigate a motion for class certification"); *Sharif v. N.Y. State Educ. Dep't*, 709 F. Supp. 345, 359 (S.D.N.Y. 1989) (concluding for purposes of an irreparable harm analysis that although the named plaintiffs might not receive a scholarship award on the basis of their SAT scores, some members of the putative class would); *Strouchler v. Shah*, 891 F. Supp. 2d 504, 517, 519 (S.D.N.Y. 2012) (considering likely harm to the putative class members at the preliminary-injunction stage); *Abdi v. Duke*, 280 F. Supp. 3d 373, 400 (W.D.N.Y. 2017) ("Under appropriate circumstances, a court may grant preliminary injunctive relief in favor of putative class members before class certification, and correspondingly, assess the harm to putative class members when considering the preliminary injunction motion."); *see also* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 9:45 (4th Ed. 2002) ("Certain circumstances give rise to the need for prompt injunctive relief for a named plaintiff or on behalf of a class" and a "court may conditionally certify the class or otherwise award a broad preliminary injunction, without a formal class ruling, under its general equity powers.").

   The risk of harm to the plaintiffs and class members is guaranteed because the program is required to expend all funds before the end of the year. "A threat of irreparable harm is

sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22). And "deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019).

Shortly after the plaintiffs filed their amended class-action complaint—and in an apparent bid to defeat a claim of classwide irreparable harm—The Contingent amended its website to announce that the defendants are no longer accepting any applications for relief. *See* https://thecontingent.org/oregon-cares/ (last visited on December 10, 2020). The defendants cannot use this maneuver to insulate their racially discriminatory practices from judicial scrutiny. The Court should order the defendants to (1) immediately reopen the application process and consider *all* applications on a race-neutral basis, and (2) stop awarding grants to those who applied under the exclusionary policy until all applications can be considered on a race-neutral basis. And the Court should act with dispatch because the defendants appear determined to spend the money as quickly as possible in an effort to escape judicial review of their patently illegal racial exclusions.

**D.     The Balance Of Equities And Public Interest Both Favor Plaintiffs**

When the government is a party, the balance-of-equities and public-interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). And by establishing a likelihood that defendants have violated the Constitution, plaintiffs have "also established that both the public interest and the balance of the equities favor a preliminary injunction." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). This is because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002; *accord Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.").

Conversely, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (the state "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations"). The public interest is unquestionably served by opening up the grant process to all Oregonians, rather than discriminating against all non-black Oregonians.

## V.  CONCLUSION

For the reasons set forth above, the Court should issue a temporary restraining order or preliminary injunction ordering defendants to (1) immediately reopen the application process for grants from the Fund and consider all applications on a race-neutral basis, and (2) stop awarding grants to those who applied under the exclusionary policy until all applications can be considered on a race-neutral basis.

Respectfully submitted,

/s/ Bradley Benbrook

| | |
|---|---|
| Jonathan F. Mitchell* | Bradley Benbrook* |
| Texas Bar No. 24075463 | California Bar No. 177786 |
| Mitchell Law PLLC | Stephen M. Duvernay* |
| 111 Congress Avenue, Suite 400 | California Bar No. 250957 |
| Austin, Texas 78701 | Benbrook Law Group, PC |
| (512) 686-3940 (phone) | 400 Capitol Mall, Suite 2530 |
| (512) 686-3941 (fax) | Sacramento, California 95814 |
| jonathan@mitchell.law | (916) 447-4900 (phone) |
| | (916) 447-4904 (fax) |
| James L. Buchal | brad@benbrooklawgroup.com |
| Oregon Bar No. 921618 | |
| Murphy & Buchal LLP | |
| 3425 SE Yamhill Street, Suite 100 | |
| Portland, Oregon 97214 | |
| (503) 227-1011 (phone) | |
| (503) 573-1939 (fax) | * admitted pro hac vice |
| jbuchal@mbllp.com | |
| | Counsel for Plaintiffs |
| Dated: December 11, 2020 | and the Proposed Class |